[Cite as *State v. Alvarado*, 2015-Ohio-75.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                         Court of Appeals No.  L-13-1225

　　　Appellee                                     Trial Court No.  CR0201301381

v.

Hector Alvarado, Jr.                          **DECISION AND JUDGMENT**

　　　Appellant                                   Decided:  January 9, 2015

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
David F. Cooper, Assistant Prosecuting Attorney, for appellee.

John Thebes, for appellant.

* * * * *

**JENSEN, J.**

{¶ 1} Hector Alvarado appeals the September 16, 2013 judgment of the Lucas County Court of Common Pleas which, following a jury trial convicting him of murder, sentenced him to 15 years to life imprisonment.  For the reasons that follow, we affirm the judgment of the Lucas County Court of Common Pleas.

{¶ 2} In the early morning hours of New Year's Day, 2013, a fight broke out at the South Beach Bar on Alexis Road in Toledo, Lucas County, Ohio. Christine Henderson suffered a fatal wound to her neck and her fiancée, Stacy Bowen, suffered a non-fatal laceration to his upper arm. Appellant, Hector Alvarado, was indicted on one count of murder in violation of R.C. 2903.02(B) and R.C. 2929.02, and one count of felonious assault in violation of R.C. 2903.11(A)(2). The case proceeded to trial by jury. The following is a summary of the evidence presented.

{¶ 3} Megan Gibson, an employee at the South Beach Bar and Grill, testified that she was working the door in the early morning hours of New Year's Day 2013 when "the bar broke out into a riot." She did not witness the assault on Bowen or Henderson. She did, however, clean-up a large amount of blood in the area Henderson was standing before she walked outside and died in the bar's parking lot.

{¶ 4} A bar patron, Charles Wells, testified that he and three of his friends were on the bar's back patio "smoking weed and drinking beer" when the violent, yet short-lived, fight began. He entered the bar, but never engaged in the fighting. Instead, he stood back and observed the commotion, keeping his eye on appellant because he was "the biggest guy in the bar."

{¶ 5} Wells explained that during the fight appellant had "an object" in his hand. He observed appellant swing the object and noted that "everybody he swung on hurried up and got away from him." Wells admitted that his view was obstructed at times because "bodies was [sic] moving, chairs was [sic] flying, people was [sic] swinging."

2.

{¶ 6} At one point, Wells observed appellant near Henderson. He explained, "I seen him swing on her and she walk [sic] away, she grabbed her neck and walk [sic] away. But I didn't know what had happened right then and there." Wells explained that appellant had the object in his hand when he "swung on" Henderson.

{¶ 7} Before the fight completely subsided, Wells and his friends left the bar through the front door. Wells explained what he observed when he stepped outside:

A. All I seen was cars, but I immediately spinned around because it was a crowd of people coming out, there was some people coming out, so then when I seen who was coming out, I turned around and started walking backwards and tripped off the curve.

Q. Did you see [appellant]?

A. He came out right behind me.

Q. What did you see him with?

A. I seen him with a Mexican girl in one hand. I seen him with a knife in another hand.

Q. Sure it was a knife?

A. Clearly I seen the knife. I wouldn't turn my back to him because I just seen him get into it with all these black people and I didn't want him to stab me too. I had my brother and them in the car. They made it in the car. I was walking backwards and my brother and them kept saying, Chuck,

get in the car; Chuck, get in the car. I said fuck that. I'm watching him.

He got a knife.

    Q. How long did you watch him?

    A. All the way until I got in the car.

{¶ 8} Wells explained that he and his friends came back to the bar later that morning so they could give another friend, a bouncer, a ride home. It was then that he heard Henderson had died and that Bowen had killed her with a bottle. He explained, "I said, hell, no, [appellant] did it."

{¶ 9} Wells did not talk to the police in the early morning hours of New Year's Day 2013. He did, however, receive a phone call from Detective Goodlet on January 8, 2013. He told the detective what he saw and agreed to come down to the station and give a recorded statement. He explained,

    A. * * * And the only reason why I really, really went down there, because like I say, I know the family and they was saying that the girlfriend's boyfriend was the one that stabbed her with a bottle and I said, hell no, huh-uh, no. And then I called my friend Dave which [sic] was the bouncer there that night and he asked me was I going down there and I said I'm going to go down there and talk to him.

    Q. Did you ever voluntarily talk to the police before?

    A. Never in my life. Where I come from that's a snitch.

{¶ 10} Wells was able to identify himself on surveillance video and various still photos taken from the video. On cross examination, Wells testified that he and Bowen

4.

were not "friends" but that he knew Bowen from the neighborhood and had played basketball with him. He also admitted that he knew Henderson because she drove a recognizable vehicle, a "hot pink truck * * * with cartoon characters on it."

{¶ 11} Dr. Diane Scala-Barnet, a deputy coroner for Lucas County, performed an autopsy on Henderson. She classified Henderson's death as a homicide and determined that a stab wound to the left side of her neck caused a complete transection of the carotid artery. In her opinion, the fatal wound was caused by an instrument with one sharp edge and one dull edge. She ruled out any suggestion that a broken bottle could have caused the wound.

{¶ 12} Dr. Scala-Barnet described the wound track as "lateral to medial and downward." In her opinion, Henderson likely received the wound from a frontal attack but she could not rule out the possibility that the wound was received from an assailant standing behind her. When asked whether it was possible for Henderson to have received the wound while bent over, Dr. Scala-Barnet stated, "[t]hat would be harder to get the downward trajectory * * * It's not impossible, but it's harder to get in there." Dr. Scala-Barnet agreed that if Henderson did receive the wound while bent over, "the assailant would almost certainly have to be lower than her." However, she added that it all depended on where the assailant was positioned relative to the Henderson's body.

{¶ 13} Dr. Scala-Barnet indicated that immediately after being stabbed, blood would have started spurting from Henderson's wound and death would have occurred

5.

within a matter of minutes. She indicated that Henderson would have been able to walk after being stabbed, but that she would have felt light headed very quickly.

{¶ 14} Bowen testified that he became involved in the melee after he noticed several of his male friends fighting with people he had never seen before. He didn't know why the fight started and indicated he had no success in trying to break things up. He did not recall fighting with appellant.

{¶ 15} Bowen identified himself, Henderson, and appellant on surveillance footage taken at the bar during the fight. He did not see appellant stab Henderson but he recalled – and the surveillance footage corroborated – that the three of them were in close proximity to each other in the moments before Henderson grabbed her neck and walked away from the melee. However, a table lifted-up and thrown during the fight, obscured the camera at the exact moment Henderson likely received the fatal stab wound to her neck.

{¶ 16} Detective William Goodlet of the Toledo Police Department testified that he interviewed Bowen shortly after the fight. While Bowen admitted to participating in the fight, he was unable to identify anyone he was fighting.

{¶ 17} Detective Goodlet went to a local hospital after receiving information that another potential witness, Basilia Smith, was being treated for injuries she received during the fight. When questioned, Smith admitted to being at the bar and receiving injuries during the melee. However, she was too intoxicated to provide any additional information helpful to the detective's investigation.

6.

{¶ 18} A few hours after he interviewed Smith, Detective Goodlet received surveillance video from the bar's numerous interior and exterior cameras. The time frame of the preliminary video spanned from 1:39:00 a.m. through 2:15:00 a.m. The detective and his team watched the video in real time but found it grainy and "really tough to follow." Detective Goodlet and his team of investigating officers made a determination to start analyzing footage of the back lot where Henderson's body was found and work back in time in an effort to determine where and when she was injured. At the time, they knew the identities of very few people in the bar. During this period of the investigation, appellant's identity was unknown, but he was one of several "persons of interest" because of his proximity to the victims during the melee.

{¶ 19} A short time later, Detective Goodlet obtained additional surveillance video. After the Detective and his team watched the additional footage, they invited Bowen back in to the station and showed him still shots of the footage. Bowen was able to identify himself, but was not able to identify any of the suspects.

{¶ 20} About a week after the incident, Detective Goodlet received a call from one of the men who had been working security inside the bar. Based upon that conversation, Detective Goodlet made contact with Wells. Detective Goodlet described his first phone conversation with Wells, as follows:

> He told me what he had seen, where he was at, he stated he was at
> the bar with his brother. He's – he's having a good time. There's
> somebody yelling, security, security, security. He comes out, sees just

7.

fighting. People fighting everywhere. He states he runs out of the bar and while he's outside the bar, he sees a large Hispanic male come out of the bar. He's got a girl in his right hand and he's got a knife in his left hand. He said he saw this Hispanic male run, run from the scene, and he said that's the guy, he did it.

A week later Wells came down to the station. During a recorded interview, but after Wells identified a "big Mexican with tattoos on his head," Detective Goodlet showed Wells still shots from the surveillance video. Wells was able to point out the appellant.

{¶ 21} At trial, Detective Goodlet indicated that the majority of Wells' recorded statement was consistent with Wells' testimony in court, with one exception; during the recorded interview, Wells did not indicate that "he observed [appellant] punching or making some striking movement at Miss Henderson."

{¶ 22} Video footage from outside the bar demonstrated that appellant arrived at 12:46 a.m. with three women. A few moments later, video footage from inside the bar depicted the three women walking past the bouncer without being patted down. Detective Goodall testified that the video showed appellant entering the bar after being given a "cursory pat down * * * at best." Detective Goodall pointed out that the bouncer did not pat appellant down towards his ankles or around his back.

{¶ 23} Video footage demonstrates that appellant was on the bar's back patio until approximately 1:55 a.m. At that time, appellant moved into the view of camera 3, inside the bar. At 1:55:58 a.m., appellant is seen on footage from camera 3 and camera 12,

8.

seated, taking a brief phone call.  There is no sign of any fighting.  At 1:59:29 a.m., appellant abruptly stands up.  At the same time, camera 11 depicts a fight on the dance floor.  In the moments that follow, appellant walks out of and then back into the view of camera 12.  Bowen is in the middle of the ruckus, but appellant is not engaged in the fight.

{¶ 24} At 2:00:32 a.m., appellant is seen speaking with one of the women he came into the bar with.  Thereafter, appellant moves away from the camera and out of view.  At 2:01:42 a.m., Bowen is depicted on camera 12; his shirt and hat are off, and he is picking up and throwing a chair towards the ruckus.  At the same time, appellant moves back into view on the far side of the screen.  The video footage on camera 12 depicts no fewer than 17 individuals participating in or in close proximity to the ruckus.

{¶ 25} At 2:01:51 a.m., Henderson is depicted on the left front side of camera 12.  Appellant is depicted on the center back of the camera's footage.  No one appears to be attacking appellant, although a chair is thrown in his general direction.  At 2:01:54 a.m., Bowen engages with an unidentified individual.  At 2:01:55 a.m., appellant moves toward Bowen and the unidentified individual.  Two frames later, appellant and Bowen are depicted near an exit door, arms swinging.  At the same time, two individuals in the forefront of the screen pick up chairs, while a third individual picks up a table.  At 2:01:58 a.m., Henderson can be seen on the edge of the screen just to the left of Bowen.  The table obscures the camera's view of appellant, Bowen, and Henderson.

9.

{¶ 26} Detective Goodall identified both Bowen and Henderson at 2:01:59 a.m. fully engaged in the ruckus. Ms. Henderson appears to be bending over and moving away from the ruckus while Bowen remains engaged with two other individuals. Henderson then stands up and backs away from the commotion. At 2:02:00 a.m., Henderson puts her left hand up to the left side of her neck. She then exits the view of camera 12 while Bowen continues to engage in the ruckus. The view of appellant is obscured for four or five frames. At 2:02:05 a.m., Bowen throws a chair towards appellant and runs out of the view of camera 12. Appellant pushes a few individuals out of the exit door, grabs one of the girls he came in with and exits the bar at 2:02:17 a.m.

{¶ 27} Meanwhile, at 2:02:07 a.m., on camera 3, Henderson is seen walking across the lobby area of the bar towards the bouncer's chair. Detective Goodall points to what he describes as "discoloration" on her shirt and explains that Henderson appears with her left hand on the left side of her neck, under her long dark hair. At 2:02:12 a.m., Wells is seen exiting the bar from the main lobby area. At 2:02:27 a.m., Bowen exits. A dark circle is visible on his upper left bicep in the area of his stab wound.

{¶ 28} At 2:02:31 a.m., on footage from camera 16, appellant is seen running through the parking lot with a woman, a second woman following close behind. Appellant and both women climb into a pick-up truck, appellant in the passenger seat, and drive towards the entrance to the bar.

{¶ 29} Before the conclusion of Detective Goodall's direct examination, he indicated that to his knowledge, only two individuals received stab wounds during the

10.

fight: Henderson and Bowen. A third individual, Smith, was treated at the hospital for injuries inconsistent with a knife wound.

{¶ 30} On cross examination, Detective Goodall confirmed he did not find a knife associated with appellant nor did he find any blood stained clothes in appellant's possession.

{¶ 31} Detective Goodall also confirmed that when he spoke with Wells on January 15, 2013, Wells did not mention that he saw appellant strike Henderson in the neck.

{¶ 32} A recording of appellant's interview with police was shown to the jury. During the interview, appellant indicated he went to the bar with a few girls and he wasn't there long before the fight broke out. He denied seeing any weapons other than beer bottles and chairs. When asked whether he stabbed Henderson, he shook his head "no."

{¶ 33} Following the presentation of evidence, the jury found appellant guilty of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony. Alvarado was found not guilty of felonious assault. The trial court sentenced Alvarado to 15 years to life in prison.

{¶ 34} In his appeal, appellant raises four assignments of error for our consideration:

> FIRST ASSIGNMENT OF ERROR: PROSECUTORIAL
> MISCONDUCT OCCURRED IN THE STATE'S REBUTTAL CLOSING
> WHEN THE STATE IMPERMISSIBLY REFERRED TO THE

11.

CONTENT OF APPELLANT'S CHARACTER AND THE APPELLANT ACTING IN CONFORMITY WITH THAT CHARACTER.

SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ABUSED ITS DISCRETION BY NOT SANCTIONING STATE FOR A DISCOVERY VIOLATION OVER THE OBJECTION OF DEFENDANT.

THIRD ASSIGNMENT OF ERROR: APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

FOURTH ASSIGNMENT OF ERROR: THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN APPELLANT'S CONVICTION.

{¶ 35} In his first assignment of error, appellant asserts that alleged prosecutorial misconduct during closing arguments deprived him of a fair trial. It is well established that the controlling test for prosecutorial misconduct is whether the disputed remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Eley*, 77 Ohio St.3d 174, 187, 672 N.E.2d 640 (1996), overruled on other grounds; *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).

{¶ 36} Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. *State v. Balew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). During closing arguments, the prosecution is free to comment upon "what the evidence has shown and what reasonable inferences may be drawn therefrom." *Lott* at 165.

12.

{¶ 37} Appellant asserts that the prosecution improperly referenced appellant's character during closing arguments on two occasions. The record shows that during closing arguments the prosecution stated,

He is proud of it. I'm not judging [appellant] for putting that, those tattoos. That's – that's his own province, if you will. But he certainly doesn't look like anyone else, does he? There is a certain individuality about him. [Appellant], we talked about first impression. I don't want to judge anybody on their first impressions, and we know that we shouldn't, but we get them. When you saw him walk into court what did you think? Probably what everybody else thinks that sees him. Is it any wonder that people see a man like this with a wielding a knife.

\* \* \*

The inference is this. If you look that way, why do you do it? [Appellant's] a big guy. Some people, it's arguable, they might be afraid of him. They might not know him. But they can look at him and say he's got a tear drop under his right eye. He's got "cholo" tattooed on his head. He's got "Mexican" tattooed on the other side of his head. And he's got significant marking all around his face.

Is it possible that people might be afraid of him on looks alone? Is it possible that people may not want to be involved in a crime that they see him doing out of fear.

13.

{¶ 38} In response, the state asserts that "[t]he prosecutor's comments about [appellant] and the reaction he induced in other bar patrons were reasonably supported by the evidence." For example, Wells testified that he watched appellant during the fight because he was the "biggest guy in the bar." Further, the state asserts that the prosecutor was simply inferring that other potential witnesses may have been intimidated by appellant's size and appearance.

{¶ 39} We agree with appellant that there is no evidence in the record from which the prosecutor could have drawn the inference that potential witnesses did not testify because of appellant's appearance. Upon reviewing the record as a whole, however, we do not find appellant was prejudiced by these statements. While the prosecutor could and perhaps should have utilized a better choice of words to explain what he felt the evidence had shown, we found no instance of misconduct that would rise to the level of reversible error. The court repeated in its jury instructions that evidence does not include opening statements or closing arguments. Appellant's first assignment of error is not well-taken.

{¶ 40} In his second assignment of error, appellant asserts that the trial court abused its discretion when it refused to limit Wells' testimony because of an asserted discovery violation. Specifically, appellant asserts that he did not hear about Wells' account of defendant striking Henderson inside the bar until the state's opening statement.

14.

{¶ 41} Crim.R. 16(B)(3) requires the state, upon written demand, to provide discovery of "[a]ny evidence favorable to the defendant and material to guilt or punishment." Under Crim.R.16(L)(1),

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule * * * the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such order as it deems just under the circumstances.

{¶ 42} "A trial court has broad discretion to determine the appropriate sanction for a discovery violation, and a trial court's decision will not be reversed absent an abuse of that discretion." *State v. Woods*, 4th Dist. Ross No. 13CA3396, 2014-Ohio-4429, ¶ 15. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Id.*, citing *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 43} Prior to trial, the state provided appellant with a statement that Wells had made to Detective Goodlet about seeing appellant leave the bar with a knife in his hand. The statement did not mention that Wells saw appellant strike Henderson inside the bar with an object in his hand.

{¶ 44} On the record, the prosecutor noted that Wells' name and address and prior statements had been properly disclosed to defense counsel and that defendant could have interviewed Wells at any time to ascertain the specifics of what he was prepared to say in

court. The state further noted that it did not hear about Wells' account of appellant striking Henderson until the day before the trial began. While it would have been preferable for the state to disclose the statement to defense counsel before opening, both the state and appellant questioned Wells about the inconsistency of his statements. "A defect of capacity, ability, or opportunity to observe, remember, or relate may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." Evid.R. 616(B). The jury could therefore chose to disregard all or part of Wells' testimony.

{¶ 45} Upon our review of the record we find no willful violation of the discovery rules on behalf of the state nor do we find a request for a continuance on behalf of appellant. Thus, the trial court did not abuse its discretion in allowing Wells' to testify about his observation. Appellant's second assignment of error is not well-taken.

{¶ 46} In his third assignment of error, appellant asserts that his conviction was against the manifest weight of the evidence. The Ohio Supreme Court has summarized the standard for reversal of a criminal conviction on the ground that it is against the manifest weight of the evidence as follows:

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trail ordered. *State v. Thompkins*, 78 Ohio St.3d

380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

"In determining whether a conviction is against the manifest weight of the evidence, we do not view the evidence in a light most favorable to the state. Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L–10–1369, 2012–Ohio–6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387. "A reversal based on the weight of the evidence, moreover, can occur only after the State both has presented *sufficient evidence* to support conviction and has persuaded the jury to convict. The reversal simply affords the defendant a second opportunity to seek a favorable judgment." (Emphasis in original.) *Id.* at 388, quoting *Tibbs v. Florida,* 457 U.S. 31, 43, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

{¶ 47} While a reviewing court considers the credibility of the witnesses in a weight of the evidence review, "that review must nevertheless be tempered by the principle that weight and credibility are primarily for the trier of fact." *State v. Pena*, 6th Dist. Lucas No. L-12-1309, 2014-Ohio-423, ¶ 22, quoting *State v. Kash*, 1st Dist. Hamilton No. CA2002-10-247, 2004-Ohio-415, ¶ 25. The trier of fact is in the best position to "view the witnesses and observe the credibility of the proffered testimony," Id. at ¶ 22, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). A jury may believe all, part, or none of a witness's testimony. *Id.* at ¶ 22.

17.

{¶ 48} Appellant was convicted of murder in violation of R.C. 2903.02(B). That section provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). Here, the predicated offense for the murder charge, as specified in the indictment, was felonious assault.

{¶ 49} Appellant does not dispute Henderson died from the injuries caused by a stab wound to her neck nor does he dispute that he was engaged in the melee. He does, however, dispute sufficient evidence was produced that any rational trier of fact could have found, beyond a reasonable doubt, that he delivered the fatal blow. In our review of the record we find that the prosecution presented evidence which, if believed, would establish beyond a reasonable doubt that appellant caused Henderson's death. Specifically, the state presented surveillance video depicting appellant in the vicinity of the victim moments before she grabbed her neck and walked away from the melee. The only "eye witness" to come forward was Wells, a convicted felon who had been acquainted with the victims but had never met appellant. Wells testified that he saw appellant swing on several people and they quickly got out of his way. He saw appellant strike Henderson in the neck while holding "an object" in his hand and then saw Henderson retreat, holding her neck. Wells further testified that he saw appellant leave the bar with a knife in his left hand. While grainy video surveillance footage showed appellant in Henderson's vicinity, a raised table was blocking the view of the camera at the moment of the fatal blow. Thus, the case largely turned on the testimony of Wells,

18.

and the jury had the primary responsibility for determining his credibility. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The jury resolved that issue against defendant, and we cannot say the jury clearly lost its way and created a manifest miscarriage of justice in doing so. Appellant's third assignment of error is not well-taken.

{¶ 50} In his fourth assignment of error, appellant asserts that the trial court erred in overruling appellant's Civ.R. 29 motion for judgment of acquittal. Civ.R. 29(A) provides:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

{¶ 51} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d

19.

259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In order to affirm the denial of a Crim.R. 29 motion, we need only find that there was legally sufficient evidence to sustain the guilty verdict. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541.

{¶ 52} For the reasons set forth in our discussion of appellant's third assignment of error, we find that the state did present sufficient evidence that any rational trier of fact could have found the essential elements of murder proven beyond a reasonable doubt. The trial court did not err in denying appellant's Crim.R. 29 motion for acquittal. Appellant's fourth assignment of error is not well-taken.

{¶ 53} Wherefore, we find that substantial justice has been done in this matter. The judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

_____
JUDGE

Stephen A. Yarbrough, P.J.

James D. Jensen, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.