[Cite as *State v. Luce*, 2017-Ohio-4472.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-16-1028

      Appellee                                Trial Court No. CR0201501474

v.

Terry Luce                                       **DECISION AND JUDGMENT**

      Appellant                                Decided:  June 23, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Steven Casiere, for appellant.

* * * * *

**JENSEN, P.J.**

## I.  Introduction

{¶ 1} Appellant, Terry Luce, appeals the judgment of the Lucas County Court of

Common Pleas, following a jury trial in which he was found guilty of one count of

endangering children and sentenced to three years in prison.

## A.  Facts and Procedural Background

{¶ 2} On March 19, 2015, appellant was indicted on one count of endangering children in violation of R.C. 2919.22(B)(1), (E)(1), and (E)(2)(d), a felony of the second degree.  Appellant entered a plea of not guilty, and a two-day jury trial commenced on January 11, 2016.

{¶ 3} As its first witness, the state called James Trevino, a firefighter and paramedic with the Toledo Fire Department.  On the afternoon of December 4, 2016, Trevino was dispatched to appellant's residence, which is located at 721 Vinton Street, Toledo, Ohio.  Upon arrival, Trevino observed appellant sitting on the porch holding his son, M.L., who was wrapped in a blanket.  Appellant informed Trevino that M.L. would not stop crying, so Trevino and his partner, Blake Molnar, placed M.L. on the porch to examine him.

{¶ 4} As part of his examination of M.L., Trevino removed the blanket in which M.L. was wrapped, thereby revealing that M.L.'s right femur was shorter than his left femur.  According to Trevino's observations of M.L., the right femur was swollen and extremely painful to the touch.  Trevino testified that M.L. appeared to be in "extreme discomfort.  You could tell he was in extreme pain, and he was visibly nervous, visibly upset when he was crying."  Trevino proceeded to ask M.L., who was approximately three years old at the time, if somebody hurt him. Without objection, Trevino testified that M.L. responded in the affirmative and informed Trevino that appellant hurt him.

2.

{¶ 5} Meanwhile, appellant was taken off of the porch and questioned by another fireman, Tom Bartley, as to M.L.'s pertinent medical information. Notably, M.L.'s crying seemed to subside after Bartley removed appellant from the porch. According to Bartley's testimony, appellant "didn't seem overly concerned with [M.L.'s] welfare." Appellant was insistent that he did not know the cause of M.L.'s injuries. Nonetheless, Bartley suspected that M.L.'s injuries were the product of abuse because of the amount of force it takes to fracture a child's femur, which Bartley described as the strongest bone in the body. Bartley testified that the only time he sees such injuries is following high-speed car accidents.

{¶ 6} Based on his suspicion of abuse, Bartley notified local law enforcement of the situation. Officers Simon Urbina and Tim Smith of the Toledo Police Department responded to the scene to investigate appellant's involvement in M.L.'s injuries. Upon arrival, the officers consulted with the firemen. Without objection, Urbina testified that the firemen informed him that M.L. had a broken leg and that M.L. had stated that appellant injured him. This testimony was echoed by M.L.'s mother, J.H., who testified that M.L. told her that appellant hurt him when she questioned him on the front porch following the incident. J.H. also stated that M.L. was not injured when she left for work earlier in the day, and that M.L. had no history of broken bones.

{¶ 7} Due to the severity of the injury, the officers requested Detective Bob Schroeder to respond to the residence. The officers then proceeded into the residence in

order to speak to appellant. M.L. was transported to the hospital via ambulance. J.H., rode with M.L. in the ambulance; appellant stayed at the residence.

{¶ 8} When asked about the cause of M.L.'s injuries, appellant stated that he did not know because he was in the living room folding socks and M.L. was in an adjacent bedroom playing with his three siblings when he heard M.L. make a noise. Appellant told the officers that he directed M.L. to come to him and he proceeded to change M.L.'s diaper after M.L. walked into the room. While changing M.L.'s diaper, appellant noticed that M.L.'s right leg was swelling and painful to the touch. Appellant then called J.H., who directed him to call 911.

{¶ 9} After speaking to appellant, Urbina questioned the oldest child about the incident. According to Urbina's testimony, the child, who was seven years old, "said that she thought [M.L.] had jumped off of a table. There was a small coffee table in this larger room where the clothes were at, and that's what she thought happened." However, another child spoke up and indicated that the children were playing video games in another room, making it impossible for the children to have witnessed the incident. Urbina stated that the coffee table was two feet tall and was within two feet of the area at which appellant was allegedly folding socks.

{¶ 10} Eventually, the incident was referred to Lucas County Children Services (LCCS) for an investigation into potential abuse. The LCCS investigator overseeing the matter, Brynn Burr, testified at trial concerning the investigation and the agency's

4.

conclusions flowing from that investigation. Notably, Burr testified that, during the course of the agency's investigation, appellant informed her that he

> picked [M.L.] up by one arm and by one leg opposite, opposite of each other, and he stated that he threw him up over his shoulder crooked and threw him down then on the floor, and at that time [M.L.] curled his legs up under him, and then [appellant] said he forced his legs down to change his diaper and realized at that point that his leg was messed up. And he said at that point he wished he hadn't forced his leg down, and he believes at that point that that is when the injury occurred, and he stated that he did not mean to harm his child.

Later on in her testimony, Burr was asked whether LCCS found the allegations of abuse to be substantiated. Before she could answer the question, defense counsel objected, and the trial court sustained the objection. Immediately thereafter, the state asked Burr whether she believed that M.L. was physically abused based upon her training and experience, to which she responded in the affirmative over the objection of appellant's trial counsel. Burr also indicated that she believed that appellant was the perpetrator of the abuse.

{¶ 11} As part of LCCS's abuse investigation, Dr. Randall Schlievert examined M.L. in December 2014. At trial, Dr. Schlievert testified as to his qualifications as an expert in the treatment and diagnosis of serious physical harm and child abuse.

5.

Ultimately, Dr. Schlievert was qualified as an expert without objection from defense counsel.

{¶ 12} During his testimony, Dr. Schlievert indicated that he questioned J.H. concerning M.L.'s medical history. Based on J.H.'s articulation of the medical history, Dr. Schlievert concluded that there was no history of easily broken bones or fragility on the part of M.H. Indeed, upon examination, Dr. Schlievert stated that M.L. presented as a "generally healthy, well child. Didn't have any of the signs for brittle bone disease which is called osteogenesis imperfecta." Despite M.L.'s typical bone structure, Dr. Schlievert noted that the x-rays of M.L.'s femur revealed a spiral fracture that was caused by "severe twisting and bending on this leg." When questioned as to the amount of force required to generate a fracture this nature, Dr. Schlievert stated: "[G]enerally a fracture like this we don't see this from average daily household falls, accidents, injuries, falls off bikes, falls downstairs, falls off furniture, being dropped. Those fractures look different. They're hairlines. They're not displaced. * * * But this is a very suspicious injury in a 2 year old." Dr. Schlievert went on to testify that M.L.'s injury could not have occurred as a result of M.L. jumping off of the coffee table as appellant asserted. Ultimately, Dr. Schlievert opined that M.L.'s injury was the product of intentional physical abuse.

{¶ 13} At the conclusion of the state's case in chief, appellant moved for an acquittal under Crim.R. 29, which the trial court denied. The trial court then questioned appellant as to whether he wished to testify. Appellant indicated that he did not wish to testify, and defense counsel informed the court that appellant would not be calling any

6.

additional witnesses. After receiving its instructions and closing arguments, the jury found appellant guilty of endangering children. Thereafter, the trial court set the matter for sentencing and ordered the preparation of a presentence investigation report.

{¶ 14} At sentencing, the trial court imposed a three-year prison sentence and found that appellant had the means to pay the costs of supervision, confinement, assigned counsel, and prosecution. The court ordered appellant to reimburse the state for such costs.

## B. Assignments of Error

{¶ 15} Appellant has timely appealed the court's judgment, asserting the following assignments of error for our review:

I. Appellant was denied his right to due process and a fair trial when the trial court denied his Rule 29 motion.

II. Appellant was denied his right to due process and to a fair trial as his conviction fell against the manifest weight of the evidence.

III. Appellant was denied his right to due process and to a fair trial by the admission into evidence of inadmissible hearsay.

IV. Appellant was denied his right to due process and to a fair trial when the Lucas County Children Services caseworker provided improper opinion testimony.

7.

V. The trial court erred to the prejudice of appellant by allowing the state's expert witness to testify since his expert report did not comply with Crim.R. 16(K).

VI. The trial court erred to the prejudice of appellant by ordering him to pay costs for confinement and assigned counsel fees.

## II. Analysis

### A. Denial of Crim.R. 29 Motion

{¶ 16} In his first assignment of error, appellant argues that the trial court erred in denying his Crim.R. 29 motion for acquittal.

{¶ 17} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. In reviewing a conviction for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 18} Appellant was convicted of endangering children under R.C. 2919.22, which states, in pertinent part:

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

8.

(1) Abuse the child;

* * *

(E)(1)  Whoever violates this section is guilty of endangering children.

Because the foregoing language defining the offense of endangering children neither specifies culpability nor plainly indicates a purpose to impose strict liability, the state must also establish that appellant acted recklessly in this case.  R.C. 2901.21(C)(1). Pursuant to R.C. 2901.22(C), a person acts recklessly when, "with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."

{¶ 19} Here, appellant argues that the state failed to establish that he recklessly caused M.L.'s injury.  According to appellant, the evidence presented by the state leaves open the question of how M.L.'s injury occurred.

{¶ 20} In *State v. Bryan*, 5th Dist. Stark No. 2011CA00054, 2011-Ohio-4619, the Fifth District considered whether the state introduced sufficient evidence on the element of recklessness in a child endangering case.  There, as here, the state's medical expert testified that the injury, seven rib fractures, "[does] not occur with usual household events * * * just about the only way that can happen is if a child is picked up and, and his chest is manually squeezed with, with a violent force to cause the fractures to occur."  *Id.* at ¶ 29.  Relying upon this testimony, the court held that the state's evidence was sufficient to establish the defendant's recklessness.  *Id.* at ¶ 30.

9.

**{¶ 21}** Similarly here, Dr. Schlievert established that a spiral fracture to the femur is not the sort of injury that would occur without significant force akin to physical abuse. Further, M.L. implicated appellant at the scene of the incident when he stated "dad hurt me." J.H. testified that M.L. was not injured when she left for work earlier in the day, and that M.L. had no history of broken bones.

**{¶ 22}** Given the fact that M.L. was in appellant's exclusive care from the time J.H. left for work until the time that the injury occurred, paired with M.L.'s implication of appellant immediately after the injury and the testimony that the injury could not have occurred by accident, we find that a reasonable trier of fact could find that appellant recklessly abused M.L. beyond a reasonable doubt.

**{¶ 23}** Accordingly, appellant's first assignment of error is not well-taken.

### B.  Manifest Weight of the Evidence

**{¶ 24}** In his second assignment of error, appellant asserts that his conviction was against the manifest weight of the evidence.  When reviewing a manifest weight claim,

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the

10.

evidence weighs heavily against the conviction. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220.

**{¶ 25}** In essence, appellant advances the same argument he raised in his first assignment of error, namely that it is unclear from the evidence what, if any, involvement he had in M.L.'s injury. For the reasons already stated in our analysis of the first assignment of error, we do not find that this is the exceptional case warranting reversal on manifest weight grounds. The state introduced extensive uncontested evidence supporting the jury's determination that appellant recklessly abused M.L. and caused the spiral fracture to M.L.'s femur.

**{¶ 26}** Accordingly, appellant's second assignment of error is not well-taken.

### C. Admission of Hearsay Evidence

**{¶ 27}** In his third assignment of error, appellant argues that the trial court erred in allowing hearsay testimony to be admitted into evidence. Specifically, appellant contends that the trial court erred in allowing several witnesses to testify as to M.L.'s statements that appellant hurt him.

**{¶ 28}** Hearsay is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C). Hearsay is inadmissible unless it falls within a specific exception outlined in the rules of evidence. Evid.R. 802. Relevant here, Evid.R. 803(2) allows the admission of statements relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. This is known as the excited utterance exception.

11.

**{¶ 29}** The following four-part test is applied to determine the admissibility of statements as an excited utterance:

(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166 (citations omitted).

**{¶ 30}** M.L.'s statements were referenced at trial by Trevino, J.H., and Urbina. Trevino testified that he asked M.L. if somebody hurt him, to which M.L. responded in the affirmative and informed Trevino that appellant hurt him. J.H. also testified that M.L.

told her that appellant hurt him during their conversation on the front porch immediately following the incident.

{¶ 31} Upon review, we find that M.L.'s statements to Trevino and J.H. satisfy the four-part test outlined above. Specifically, the statement was made by M.L. in the immediate aftermath of his femur being fractured; this certainly qualifies as an event "startling enough to produce a nervous excitement" in M.L. sufficient to "still his reflective faculties" and "render his statement of declaration spontaneous and unreflective" under the first part of the test. Additionally, Trevino testified that he responded to the scene six minutes after he was dispatched. Thus, although the statement was not contemporaneous with its exciting cause, we find that the short passage of time that occurred between the cause and the statement was not long enough for a boy of M.L.'s age to regain his reflective faculties under part two of the test. *In re D.M.*, 158 Ohio App.3d 780, 2004-Ohio-5858, 822 N.E.2d 433, ¶ 13 (8th Dist.) ("The scrutiny for the child declarant is less than that for an adult. The liberal scrutiny is based on the court's recognition that young children are more trustworthy because of their limited reflective powers."). That the statement was related to the startling occurrence and personally observed by M.L. as required under part three and four of the test, respectively, is self-evident and indubitable.

{¶ 32} Notwithstanding our finding that M.L.'s statements satisfy the four-part test enunciated in *Jones*, appellant argues that this was not an excited utterance because Trevino's question was leading. Relevant here, the Supreme Court of Ohio has stated

13.

that "[t]he admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 95.

{¶ 33} As noted above in our recitation of the facts, M.L.'s statement to Trevino was precipitated by Trevino asking M.L. if somebody hurt him. This question was neither coercive nor leading in that it did not seek to implicate any particular individual or suggest a specific answer. Rather, Trevino's question merely enabled M.L. to convey his thoughts. Moreover, the question did not destroy the domination of the nervous excitement over M.L.'s reflective faculties. Therefore, we find that M.L.'s response to Trevino's question was admissible at trial under the excited utterance exception.

{¶ 34} Finally, Urbina also referenced M.L.'s statement during his testimony, stating that he was informed by the first responders that M.L. had a broken leg and that M.L. had stated that appellant injured him. This testimony does not constitute hearsay because, when considered in its context, it was not offered for the truth of the matter asserted but, rather, in order to explain Urbina's investigative process. Even assuming for the sake of argument that Urbina's statement constituted inadmissible hearsay, its admission was harmless in light of the fact that M.L.'s statements were referenced by Trevino and J.H. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

14.

**{¶ 35}** Accordingly, appellant's third assignment of error is not well-taken.

### D. Opinion Testimony

**{¶ 36}** In his fourth assignment of error, appellant asserts that the trial court erred in allowing Burr to testify that she believed that M.L. was physically abused and that appellant was the perpetrator of the abuse without first being qualified as an expert. Undoubtedly, Burr was not qualified as an expert in this case. Under Evid.R. 701 and 704, a lay opinion on the ultimate issue to be decided by the trier of fact may be given if the standards of admissibility under Evid.R. 701 are met. *See Lee v. Baldwin*, 35 Ohio App.3d 47, 49, 519 N.E.2d 662 (1st Dist.1987). Pursuant to Evid.R. 701, lay opinion testimony must be: "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

**{¶ 37}** Here, Burr's opinion that appellant abused M.L. was the product of her investigation into the allegations of abuse. This investigation included, inter alia, Burr's questioning of appellant regarding M.L.'s injuries. During her initial questioning, Burr testified that appellant insisted he knew nothing about the cause of M.L.'s injuries. However, he subsequently changed his story, explaining that he

> picked [M.L.] up by one arm and by one leg opposite, opposite of each
> other, and he stated that he threw him up over his shoulder crooked and
> threw him down then on the floor, and at that time [M.L.] curled his legs up
> under him, and then [appellant] said he forced his legs down to change his
> diaper and realized at that point that his leg was messed up. And he said at

15.

that point he wished he hadn't forced his leg down, and he believes at that point that that is when the injury occurred.

{¶ 38} Based on the foregoing, Burr concluded that appellant had abused M.L. This conclusion, and the subsequent testimony to that effect, was rationally based on Burr's perceptions during the investigation. However, we find that Burr's testimony that appellant abused M.L. was not helpful to the trier of fact but, rather, usurped the role of the trier of fact to make that determination on its own based on the evidence presented at trial. Given the evidence that the severity of M.L.'s injury was indicative of abuse and that M.L. was in appellant's exclusive care at the time of the injury, Burr's opinions were not necessary to enable the trier of fact to determine whether appellant abused M.L. Accordingly, we find that Burr's testimony was not admissible under Evid.R. 701, and was therefore improperly admitted at trial.

{¶ 39} Notwithstanding our finding that the trial court erred in allowing Burr to express her opinion that appellant abused M.L., we find that the error is harmless. Error is harmless if "there is no reasonable possibility that the evidence may have contributed to the accused's conviction." *State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976), paragraph seven of the syllabus. In considering the issue of harmless error appellate courts are to "assess the impact" of the inadmissible testimony on the jury. *State v. Rahman*, 23 Ohio St.3d 146, 151, fn. 4, 492 N.E.2d 401 (1986).

{¶ 40} In this case, the record contains a plethora of uncontested evidence pointing to the fact that appellant abused M.L. Notably, M.L. indicated that appellant hurt him in

16.

the immediate aftermath of the injury. Further, the medical evidence establishes that the spiral fracture to M.L.'s femur was a significant injury that would have required a tremendous amount of force to inflict. Finally, M.L. was in appellant's sole care at the time of the injury. Appellant's claim that he did not know how M.L. was injured is implausible in light of his admission to Burr that he forced M.L.'s leg down while changing his diaper. Given this evidence, we find that the trial court's erroneous admission of Burr's opinion testimony was harmless beyond a reasonable doubt insofar as it did not contribute to appellant's conviction in any meaningful way.

{¶ 41} Accordingly, appellant's fourth assignment of error is not well-taken.

### E. Failure to Comply with Crim.R. 16

{¶ 42} In his fifth assignment of error, appellant argues that the trial court erred in allowing Dr. Schlievert to testify because his expert report did not comply with Crim.R. 16(K).

{¶ 43} Crim.R. 16(K) provides:

(K) Expert witnesses; Reports. An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to

disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 44} In this case, Dr. Schlievert testified as an expert in the treatment and diagnosis of serious physical harm in child physical abuse. Following a colloquy pertaining to Dr. Schlievert's background and qualifications as an expert in the field of child abuse, the trial court asked defense counsel if he wished to inquire as to Dr. Schlievert's qualifications. Defense counsel declined to do so. The court then asked defense counsel whether he objected to certifying Dr. Schlievert as an expert. Counsel responded in the negative. Notably, at no point throughout the course of Dr. Schlievert's testimony did appellant raise the issue of Dr. Schlievert's failure to provide a compliant expert report under Crim.R. 16(K). Because appellant did not object at trial to Dr. Schlievert testifying as an expert, we review for plain error.

{¶ 45} Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.*, citing *Long* at paragraph two of the syllabus.

18.

**{¶ 46}** In *State v. Klein*, 9th Dist. Summit No. 26573, 2013-Ohio-3514, the Ninth District was tasked with reviewing a trial court's decision to allow a police officer to testify as an expert in crash investigations where no report was provided to the defendant prior to trial and the defendant did not object to the officer's qualifications as an expert. In finding no plain error in the trial court's admission of the officer's testimony, the appellate court relied upon three facts, which we construe generally as follows: (1) the witness's testimony was based upon his personal observations and perceptions, and not as an expert offering a hypothetical opinion; (2) the witness was listed on the state's witness list, and the relevant materials on which the witness based his testimony were provided during discovery; and (3) the jury could have reasonably determined that the defendant was guilty based on other admissible evidence contained in the record. *Id.* at ¶ 19.

**{¶ 47}** Likewise, in this case Dr. Schlievert's testimony was based on his examination of M.L., review of M.L.'s medical records, and his interview of J.H. Further, M.L.'s medical records containing Dr. Schlievert's clinical notes were provided to appellant on June 23, 2015, over six months prior to trial. One week earlier, the state's discovery response was filed indicating that "anyone identified in the enclosed materials may be called at trial on behalf of the State of Ohio." The state followed up with its continuing duty to disclose discovery by providing appellant with Dr. Schlievert's curriculum vitae on August 18, 2015, approximately five months prior to trial. Finally, the remaining admissible evidence contained in the record contains much of the same information as Dr. Schlievert provided during his testimony. In particular, Bartley

19.

indicated that he suspected that M.L.'s injuries were the product of abuse due to the amount of force it takes to fracture a child's femur. Bartley described the femur as the strongest bone in the body, and testified that the only instances in which he had seen fractured femurs was following high-speed car accidents. Bartley went on to state that he had "seen people falling off garages and so forth and [a broken femur] doesn't happen."

{¶ 48} In sum, we find that Dr. Schlievert's testimony was based on his personal observations and perceptions, was not entirely unexpected in light of his timely disclosure as an expert witness, and did not impact the outcome of the trial given the remaining admissible evidence. Therefore, we hold that this case does not present the sort of exceptional circumstances that would require reversal in order to prevent a manifest miscarriage of justice. Accordingly, appellant's fifth assignment of error is not well-taken.

### F. Costs for Confinement and Assigned Counsel

{¶ 49} In his sixth and final assignment of error, appellant asserts that the trial court erred in ordering him to pay costs for confinement and assigned counsel fees.

{¶ 50} Prior to the imposition of costs of assigned counsel and confinement, the trial court must first find that the defendant has or will have the ability to pay. *State v. Baughman*, 6th Dist. Lucas No. L-11-1045, 2012-Ohio-5327, ¶ 43. As stated in *Baughman*, the court is not required to conduct a hearing on a defendant's ability to pay; rather, the record must contain some evidence that the court considered the defendant's

financial ability to pay. *Id.*, citing *State v. Maloy*, 6th Dist. Lucas No. L-10-1350, 2011-Ohio-6919, ¶ 13.

{¶ 51} In this case, the trial court's sentencing entry contains the following language regarding costs:

Defendant found to have, or reasonably may be expected to have, the means to pay all or part of the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law. Defendant ordered to reimburse the State of Ohio and Lucas County for such costs.

{¶ 52} At the sentencing hearing, the trial court further stated: "Defendant is found to have, or reasonably expected to have, the means to pay all or part of the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law, and you're ordered to reimburse the State of Ohio and Lucas County for such costs."

{¶ 53} Appellant argues that there is no evidence in the record to support the trial court's finding that he has the ability to pay the costs of confinement or appointed counsel fees. Our review of the record reveals that appellant was 30 years old at the time of sentencing and had not graduated from high school. Appellant was unmarried with four dependents and the record reveals no health or medical issues. The record shows that appellant performed "under-the-table" construction jobs for his financial support for the majority of his adult life. Additionally, appellant was able to obtain part-time employment with Impact Employment Solutions for a short time prior to his

21.

incarceration. Based on this evidence, we find that the record supports the trial court's imposition of the costs of prosecution and appointed counsel. Indeed, appellant has demonstrated an ability to earn a living in the past, albeit in a manner that unlawfully avoids his federal, state, and local income tax obligations. There is nothing in the record that would lead us to conclude that appellant will not be able to continue to earn a living in a more honest manner after he is released from incarceration.

{¶ 54} Accordingly, we find that appellant's sixth assignment of error is not well-taken.

### III. Conclusion

{¶ 55} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.     _____
               JUDGE

Arlene Singer, J.

               _____
James D. Jensen, P.J.       JUDGE
CONCUR.

               _____
               JUDGE