[Cite as *State v. Boaston*, 2017-Ohio-8770.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. L-15-1274 |
| Appellee | Trial Court No. CR0201401647 |
| v. | |
| Ronald Boaston | **DECISION AND JUDGMENT** |
| Appellant | Decided:  December 1, 2017 |

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Stephen P. Hanudel, for appellant.

* * * * *

**JENSEN, P.J.**

{¶ 1} Defendant-appellant, Ronald Boaston, appeals from a murder conviction and sentence imposed in connection with the 2014 death of his ex-wife, Brandi Gonyer-Boaston.  For the reasons that follow, we affirm the judgment of the trial court.

**{¶ 2}** On the morning of February 15, 2014, Brandi Gonyer-Boaston was found dead in the hatchback of her Dodge Journey. Her vehicle was parked, engine running, more than 35 feet off a rural roadway in a snow-covered field in Fulton County, Ohio.

**{¶ 3}** On April 21, 2014, the Lucas County Grand Jury returned a two-count indictment against Boaston: one count of aggravated murder in violation of R.C. 2903.02(A) and 2929.02, an unclassified felony, and one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified felony.

**{¶ 4}** At a trial by jury, the following evidence was adduced.

**{¶ 5}** Brandi first met Boaston when she worked as a babysitter for Boaston's three children. In time, Brandi and Boaston began a relationship with each other and had two children together. They married in October 2005 and divorced in October 2006. Brandi became involved with another man and bore his child. A short time after Brandi's third child was born, Brandi and Boaston reentered into a relationship. They moved into an apartment with five of the six children (Boaston's two children from another marriage, the two children Brandi and Boaston share, and the child Brandi had with another man).

**{¶ 6}** In 2013, Brandi finished nursing school and began working at Arbors of Waterville. There, she met co-worker Daron Walls-Jones. Brandi was flirtatious with Daron at work, by text, and by phone. In October of 2013, Boaston became aware of Brandi's relationship with Daron. From October of 2013 until her death in February 2014, Boaston installed three different types of spyware on Brandi's mobile phone. The

spyware allowed him to track her location, read her text messages, and listen to her telephone conversations.

{¶ 7} Sometime in late January or early February 2014, there was an incident involving Brandi and Boaston in the bathroom of the apartment they shared. A woman that lived next door to the family indicated that she heard running water and a woman's scream. She also felt a "vibration" through the shared wall.

{¶ 8} Boaston's son, W.B, was 16 at the time of Brandi's death. W.B. testified that one afternoon, a few weeks before Brandi died, he came home from school and saw Brandi walk out of the bathroom with a towel on her head. She "was purple with black eyes." It appeared to him as though Brandi had just gotten out of the bath or shower. W.B. explained, "from her head down she was purple and blue, looked like she had lack of oxygen. She showed me her shoulders and her arms and they were colored the same way as her face." She appeared "upset and scared." Over Boaston's objections, W.B. stated, "She told me that she was taking a bath, dad was just shaving, minding his own business, they were talking. Then out of nowhere, seemed like nobody was inside of his body anymore, he just pounced on her and tried to drown her." W.B. indicated that after the bathtub incident, Brandi started the process of moving out of the apartment. On February 3, 2014, Brandi and Boaston informed the children that they were separating.

{¶ 9} On the witness stand, Brandi's mother, Cindy Gonyer-Rumer, recalled seeing Brandi a few weeks before she died. Cindy had purchased a new pair of shoes for Brandi and insisted that Brandi come to her home to pick them up. When Brandi arrived,

3.

her face was hidden under the hood of her sweatshirt. Cindy insisted that Brandi put her head down. That is when Cindy noticed that Brandi's eyes were black and blue and her nose was a little crooked. Over Boaston's objections, Cindy explained:

> [Brandi] started crying and she told me that what happened was bad. So my thought was that he raped her and she said, no, it was worse than that. And I said, well, what could be worse than that? And she said, he tried to drown me. And I goes, what do you mean, he tried to drown you? And she goes, yeah, she goes, he asked me to take a bath with him, so I was in the tub, he was shaving his head. She goes, and I never seen this look on his face before and he jumped on me * * * She said that that – that he tried to drown her and she was fighting him off.

When asked to describe Brandi's demeanor at the time of the conversation, Cindy stated, "[Brandi] was really upset and she told me that he was gonna kill her one of these days. And I said, then let's go to the cops or something, Brandi, you know. And she said, no, mom, I can't. She said, I won't be able to see my kids."

{¶ 10} Some of Brandi's co-workers also testified about statements Brandi made regarding the alleged bathtub incident. Judy Holmes testified that once every two weeks she worked the same shift as Brandi at Arbors of Waterville. Judy never saw any injuries on Brandi. However, she did recall a conversation she had with Brandi the day before she died wherein Brandi indicated that she was no longer with Boaston because "he tried to drown her in the bathtub."

4.

{¶ 11} Shelby Hanes also worked with Brandi at Arbors of Waterville. Shelby recalled going into work one day—perhaps three to seven days before Brandi died—and noticing "what looked like popped blood vessels in her eyes * * * so it appear[ed] as though she had two black eyes." Brandi told Shelby that she received the injury by running into a door. Brandi asked Shelby to help her "cover the bruises" with make-up. Queen Anderson also worked with Brandi at Arbors of Waterville. Queen testified that she noticed a "mark" on Brandi's face on the day Shelby covered it with make-up. Queen could not remember where the mark was. She did, however, recall a conversation regarding the bathtub incident. Queen testified:

> [Brandi] told me that her and her husband had got into a disagreement or argument. * * * She didn't say what the argument was about, she said that she thought everything was fine between them, you know, that he ran her a bath water and she took a bath. She said she don't know what happened, what triggered him, but he came in the bathroom and he tried to hold her down in the tub. She said that that's when she was getting out of the tub – trying to get out and she hit her face. * * * But she didn't say anything about, you know, him hitting her or anything, she said that he was holding her down in the water and that's how she got the mark on her face.

{¶ 12} One of Boaston's friends also testified about the bathtub incident. Derek Wood testified that he and Boaston had been friends for 12 or 13 years. A few weeks

5.

before Brandi's death, Boaston told Derek that he and Brandi had gotten into an argument in their apartment bathroom. Derek explained:

A. [Boaston] texted me and said, I fucked up.

Q. And did he elaborate?

A. There was really no – too much elaboration via text message but he kind of just told me – kind of described the scenario of what happened. We talked about it more in person though. * * * That they were arguing in the bathroom and that she says that he held her under water and that she couldn't, you know, breathe for a few seconds and then he let her up and – but he said that he didn't remember doing anything like that to her and did not remember hitting her either.

{¶ 13} On Monday, February 3, 2014, Brandi placed her apartment key in Boaston's mailbox and packed some things in a tote. She began staying with her mother, Cindy.

{¶ 14} Despite what had occurred between Brandi and Boaston in the apartment bathroom, Brandi continued to see and communicate with Boaston on a daily basis. On numerous occasions, she went over to Boaston's apartment and helped him get the children ready for school and assist with the children's homework.

{¶ 15} On February 10, 2014, Brandi and her mother signed a rental application for a mobile home. Brandi listed her three children as dependents on the application.

6.

**{¶ 16}** On February 12, 2014, Cindy received a phone call from her daughter. Brandi informed Cindy that Boaston was with her at Cindy's home. When Cindy arrived at her home a few minutes later, Boaston was standing on the porch holding the screen door ajar. Boaston followed Cindy into the home and shut the door. According to Cindy, Boaston started talking to Brandi and told her that either Brandi or Daron "was gonna pay." Despite the heated conversation, Brandi agreed to follow Boaston to Target to purchase Valentine's Day treats for the kids.

**{¶ 17}** Brandi worked her usual shift from 6:00 p.m. to 6:00 a.m., February 12-13, 2014. After work, Brandi went to Boaston's apartment to help get the children off to school. Brandi stayed alone with Boaston for six hours. Boaston later reported to a friend that he and Brandi had sex while they were alone together.

**{¶ 18}** Brandi worked from 6:00 p.m. to 7:00 a.m., February 13-14, 2014. While at work, Brandi made plans with co-worker Judy Holmes to go out to a club on Valentine's Day evening. From 8:34 p.m. on February 13, 2014 through 2:20 a.m. on February 14, 2014, Brandi and Daron exchanged 46 text messages, some of which were sexual in nature.

**{¶ 19}** Meanwhile on the evening of February 13, 2014, Mark Reno was hanging out with his friend, Matt Gwozdz. Matt and Boaston were friends. Sometime between 9-11:00 p.m., Boaston arrived at Gwozdz's home. When Reno headed towards the door to leave, Boaston followed him. Boaston asked Reno if he could "get a gun" or knew anyone that could "take care of business." Reno asked Boaston if he needed him to

7.

"gather up the home boys and go take care of some shit." Boaston said "something like that, but deeper." Reno asked Boaston, "what do you want to do? You want to pistol whip him, put him in ICU or something, send a message to him?" According to Reno, Boaston looked down and shook his head. Reno testified, "it just didn't seem, real, I blew it off and left."

{¶ 20} Boaston called Reno at 2:51 a.m. The phone call lasted nearly eight and one-half minutes. According to Reno, Boaston had called him and asked him to "have lunch and talk." Reno indicated that he did not take Boaston's lunch invitation seriously and had no intention of speaking with Boaston again.

{¶ 21} At 4:05 a.m. Boaston filled his vehicle with gasoline. He then conducted two transactions at a nearby ATM.

{¶ 22} At 7:21 a.m. on February 14, 2014, Brandi went to McDonalds and purchased two breakfast sandwiches; one for herself and one for Boaston. Brandi made it to Boaston's apartment at about 7:30 a.m. Shortly thereafter, she and Boaston each ate one of the breakfast sandwiches. The kids finished getting ready for school. The last child boarded the school bus at 8:30 a.m.

{¶ 23} W.B. never heard from Brandi on the afternoon of February 14, 2014, even though Brandi had made plans to drive W.B. and his girlfriend to a local restaurant for an early Valentine's Day dinner. According to family members, it was unusual for Brandi to fail to follow through with plans she had made. W.B. became concerned about Brandi and telephoned Brandi's brother, Kevin Gonyer. Kevin tried to contact Brandi by phone,

8.

to no avail. Every time he called he heard a message that Brandi's voice mailbox was not set up.

{¶ 24} Kevin went to Boaston's apartment and asked Boaston to track Brandi down using the spyware installed on Brandi's phone. Boaston left the room for a few moments. When he came back, Boaston informed Kevin that Brandi's phone was not on.

{¶ 25} Kevin tried to call Brandi again. This time, he heard a message that the number he called was either changed or disconnected. Kevin went to Cindy's house. Cindy began calling Brandi's phone. She too heard a message that Brandi's number had been changed or disconnected. Cindy called Boaston to ask about Brandi. Boaston informed her that Brandi had stopped by the apartment after work, paid the gas bill, and gave him her debit card and pin number with instructions to spend the rest of her paycheck on the kids. Boaston also informed Cindy that Brandi had showered and put her dirty work clothes back on before she left the apartment at 10:30 a.m. At the time, Cindy thought Boaston's statements were odd because Brandi was saving money for the mobile home. Brandi always purchased things for the children herself. Cindy also testified, and W.B. confirmed, that it was unusual for Brandi to put dirty clothes on after she showered. In fact, she often scolded the children when they did so.

{¶ 26} At 11:45 p.m. on February 14, 2014, Boaston called 911 to report Brandi's disappearance. Toledo Police Officer Martin Przybysz responded to the call. When the officer arrived at the apartment, Boaston invited him into the foyer. Boaston indicated that his ex-wife was not answering her phone and she was not at her mother's home.

9.

Boaston did not inform the officer that he had the ability to track Brandi's phone nor did he mention that Brandi's phone was turned off. Officer Przybysz characterized Boaston's demeanor as calm.

{¶ 27} Just before 8:00 a.m. on Saturday, February 15, 2014, hunters came across Brandi's vehicle parked in a snow-covered field in Fulton County, Ohio. One set of boot prints lead from the driver's side of the vehicle to the road. One of the hunters called his son, Matthew Smithmyer, a deputy with the Fulton County Sheriff's Office.

{¶ 28} When Deputy Smithmyer arrived at the scene, he noted two key fobs lying on the vehicle's front passenger seat. Officer Smithmyer opened the unlocked rear driver-side door and looked around. He then opened the rear hatch of the vehicle and found a woman's body wrapped in a clear plastic tarp. A shattered mobile phone was found on the roadway. The Bureau of Criminal Investigation was called in to process the scene.

{¶ 29} The Fulton County Sheriff's Department contacted the Lucas County Sheriff's Department who, in turn, contacted Toledo Police. Officers from each agency met at Toledo's detective bureau and discussed how to proceed with the investigation. Jeff Kozak, a detective with the Lucas County Sheriff's Department, went to Boaston's home and asked Boaston if he would be willing to go down to the bureau to speak with detectives about Brandi's disappearance. Boaston agreed. Boaston called Brandi's mother and asked her to come over to the apartment and get the kids. During the time they were waiting for Cindy to arrive, Boaston never asked the detective if they had

10.

found Brandi nor did he ask the detective whether he had any information about where Brandi might be. In Detective Kozak's opinion, Boaston appeared calm.

{¶ 30} Detective Kozak testified that when Cindy arrived to pick up the children, she was crying and begging for information about her daughter. At the time, Detective Kozak did not reveal any information about what had been found in Fulton County. Instead, he informed Cindy that they were "working on it." A few minutes after Cindy left with the children, Toledo Police Detectives arrived with a crime scene unit and a search warrant.

{¶ 31} Boaston arrived at the bureau just before 6:30 p.m. on February 15, 2014; detectives noted small scratches on Boaston's face and neck. Photographs of the injuries were presented to the jury. Boaston's coat had a 2.5 inch rip in the seam near the wound on his neck. Detectives found a glove in each pocket of Boaston's coat. One of the gloves had "a lot" of light brown human hair embedded in an outer Velcro strap and buckle. Forensic testing of the hair revealed that the DNA profile from the hairs was consistent with Brandi Boaston's DNA profile.

{¶ 32} Boaston's interview with police lasted from 6:30 p.m. on February 15, 2014, through 4:15 a.m. the following morning. The interview was recorded. Portions of the recording were redacted and the jury was shown over 4.5 hours of the interview.

{¶ 33} During the interview, Boaston told Detective Ryder that he withdrew $100 from the ATM at 4:07 a.m. on the morning of February 14, 2014, because he was "out with friends." He further indicated that he needed the money for gasoline. However, a

11.

receipt from the gas station indicates Boaston used a credit card to put $20 of fuel in his vehicle.

{¶ 34} Cell phone record analysis indicated that Brandi's cell phone utilized a tower near Delta, Ohio, at 11:15 a.m. February 14, 2014. Less than 15 minutes later, Brandi's cell phone utilized a tower near where her body was found. No signals were detected from Brandi's phone after 4:36 p.m. on February 14, 2014. During a critical time in the chronology of events (from 10:41 a.m. through 11:35 a.m.) Boaston's phone did not utilize any cell phone towers. At 11:36 a.m. Boaston's phone utilized a cell phone tower north and west of his home. Then, at 12:04 p.m., Boaston called Brandi's phone. A minute later, he texted her asking, "are you awake yet?" and "call me so we can go file taxes." He was in the vicinity of his apartment when the 12:04 call and 12:05 texts were made.

{¶ 35} Deputy Coroner Dr. Diane Scala-Barnett performed the autopsy on Brandi's body. At trial, Dr. Scala-Barnett described the injuries on Brandi's face and neck. Dr. Scala-Barnett opined that the manner of death was homicide by strangulation.

{¶ 36} After Brandi's death, Boaston appeared "calm, not caring" to some of his family members. One day, while watching the local news, Boaston commented to his son, "so far there's nothing going on with this investigation and hopefully there's nothing else and [the investigation into Brandi's death] should end soon." Boaston also said, "the evidence doesn't point towards anybody and the evidence doesn't point towards [me]."

12.

**{¶ 37}** Boaston was found guilty of murder on both counts. At sentencing, the trial court merged offenses, and the state elected to proceed on the violation of R.C. 2903.02(A) and 2929.02. The trial court sentenced Boaston to a term of life with parole eligibility after 15 years.

### First Assignment of Error

**{¶ 38}** Boaston's first assignment of error provides:

The trial court erred by allowing the coroner to opine the victim's time of death based on the contents in her stomach.

**{¶ 39}** A year before trial, the state forwarded to trial counsel a copy of Dr. Scala-Barnett's report of autopsy. Relevant to this assignment of error, the report indicates: "The stomach contains 110 cc of recognizable particles of meat and brownish-tan liquid." The report does *not* include any findings, conclusions, or opinions resulting from the deputy coroner's analysis of the stomach contents.

**{¶ 40}** Nineteen days before trial, trial counsel interviewed Dr. Scala-Barnett. During the interview, Dr. Scala-Barnett opined, based upon stomach contents that Brandi died within two hours of eating a breakfast sandwich. Surprised by this revelation, trial counsel orally requested that the state supplement the report of autopsy with a summary of Dr. Scala-Barnett's time-of-death opinion. The state refused. Trial counsel did not notify the court that the state refused to provide him with a summary of Dr. Scala-Barnett's time-of-death opinion.

13.

{¶ 41} The case went to trial by jury. After opening arguments, but before Dr. Scala-Barnett took the stand, trial counsel moved, under Crim.R. 16(K), to preclude the state from introducing evidence of Dr. Scala-Barnett's time-of-death opinion. At a bench conference, trial counsel admitted he became aware of Dr. Scala-Barnett's time-of-death opinion 19 days before trial. The state accused trial counsel of gamesmanship asserting that under Crim.R. 12, a motion to exclude the time-of-death opinion testimony should have been filed before the jury was empaneled. Upon consideration, the trial court denied Boaston's motion to exclude the time-of death opinion testimony.

{¶ 42} Dr. Scala-Barnett testified that once an individual dies, digestion ceases. She explained that a small meal begins to empty from the stomach in about two hours. Dr. Scala-Barnett opined that Brandi died "within one to two hours after she ate her [breakfast] sandwich."

{¶ 43} On appeal, Boaston contends that the trial court abused its discretion when it overruled his motion to exclude the time-of-death testimony under Crim.R. 16(K). He further asserts that the deputy-coroner's time-of-death opinion testimony was prejudicial and contributed to his conviction.

{¶ 44} "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake County*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

14.

**{¶ 45}** For decades, Crim.R. 16 has governed discovery and inspection in criminal cases. In October 2009, the Supreme Court Commission on the Rules of Practice and Procedure proposed an overhaul of Crim.R. 16 to provide more open discovery in criminal cases. Grove, *Criminal Discovery in Ohio: "Civilizing" Criminal Rule 16*, 36 Dayton L.Rev. 143, 144 (2011). Comprehensive changes to Crim.R. 16 went into effect July 1, 2010.

**{¶ 46}** In regard to witnesses, former Crim.R. 16(B)(1)(e) required the prosecutor, upon request, to provide to the defendant the names and addresses of all witnesses that the state intended to call at trial. If a party failed to comply with discovery, the trial court had complete discretion to formulate an appropriate remedy. Former Crim.R. 16(E)(3) provided:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

**{¶ 47}** Nothing under the prior version of Crim.R. 16 required an expert to prepare a written report. However, the new Crim.R. 16(K) specifically provides, "An expert witness for either side *shall* prepare a *written* report summarizing the expert witness's

15.

testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualification." (Emphasis added). The rule further states:

> The written report and summary of qualifications shall be subject to disclosure under this rule *no later than twenty-one days prior to trial*, which period may be modified by the court for good cause shown, which does not prejudice any other party. *Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.* (Emphasis added.) *Id.*

{¶ 48} Here, Boaston argues that Crim.R. 16(K) is unambiguous. He asserts that the state's failure to amend the report of autopsy, in writing, to include a summary of Dr. Scala-Barnett's time-of-death opinion is a clear violation of the rule. Boaston further asserts that when the state's failure to amend was brought to the trial court's attention, the trial court had but one option: to exclude Dr. Scala-Barnett's time-of-death opinion testimony.

{¶ 49} For the following reasons, we find that Boaston waived his right to assert error under Crim.R. 16(K). Thus, we will not address whether Crim.R. 16(K) is as unambiguous as Boaston contends. We caution that our decision should in no way be construed as validation of the state's refusal to respond to Boaston's oral request to supplement the report of autopsy to include a summary of Dr. Scala-Barnett's time-of-death opinion.

16.

{¶ 50} Crim.R. 12 governs pleadings and pretrial motions. Division (A) provides that "[d]efenses and objections raised before trial which heretofore could have been raised by one or more of them shall be raised only by motion to dismiss or to grant appropriate relief, as provided in these rules." Crim.R. 12(C) states: "Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue. The following *must* be requested before trial: * * * (4) Requests for discovery under Crim.R. 16." With some limited exceptions, all pretrial motions must be made within 35 days after arraignment or 7 days before trial, whichever is earlier. Crim.R. 12(D). Failure by a defendant to timely raise defenses or objections "shall constitute waiver of the defenses or objections." Crim.R. 12(H).

{¶ 51} Relevant to our inquiry is Crim.R. 16(A), which sets forth the rule's purpose and scope. Crim.R. 16(A) provides, in relevant part, as follows:

This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. *All duties and remedies are subject to a standard of due diligence*, apply to the defense and the prosecution equally, and are intended to be reciprocal. (Emphasis added).

Previously, we have defined "due diligence" as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." *Doe v. Robinson*, 6th Dist. Lucas No. L-07-1051, 2007-Ohio-5746, ¶ 41, citing Black's Law Dictionary (8 Ed.Rev.2004) 488.

{¶ 52} Also relevant to our inquiry is Crim.R. 16L(1) which states:

> The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with the rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery, or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶ 53} Considering the due diligence requirement of Crim.R. 16(A), the trial court's obligation upon notification that a party has failed to comply with a discovery rule to fashion a just remedy under Crim.R. 16(L)(1), and the pretrial motion requirements set forth in Crim.R. 12, we find that trial counsel, with pretrial knowledge that the deputy coroner had formed an opinion about Brandi's time of death was obligated to bring the state's failure to supplement the coroner's report to the attention of the trial court by motion *before* the jury was empaneled. Boaston's failure to file a pretrial motion to compel or exclude the evidence constitutes a waiver of his Crim.R. 16(K) objection. *See*

18.

Crim.R. 12(H). Any other conclusion by this court would encourage the gamesmanship long discouraged by the Criminal Rules, and would be contrary to the commission's intent to ensure, under a due diligence standard, open discovery in criminal cases. *See State v. Howard*, 56 Ohio St.2d 328, 333, 383 N.E.2d 912 (1978). ("The philosophy of the Criminal Rules is to remove the element of gamesmanship from a trial."). Boaston's first assignment of error is not well-taken.

## Second Assignment of Error

{¶ 54} In his second assignment of error, Boaston asserts that:

> The trial court erred by allowing testimony insinuating that appellant's winter glove buckle matched and caused the bruise on the victim's chin.

{¶ 55} At trial, Dr. Scala-Barnett explained to the jury the injuries she found on Brandi's body during the autopsy. She noted that there was a "very unusual-looking abrasion" under Brandi's chin. Two days after the autopsy was complete, Detective Lenhardt brought a number of items to the morgue to do a side-by-side comparison. Included in the items taken to the morgue was the pair of gloves found in Boaston's coat. On the outside of each glove was a patch of Velcro and a buckle. Dr. Scala-Barnett covered Brandi's body with clear plastic and she and Detective Lenhardt "test-fitted" the buckle to the abrasion. Photographs that were taken during the test-fitting were presented to the jury at trial. Dr. Scala-Barnett explained her finding to the jury:

A.  So there you have that same abrasion you saw and she's all covered in plastic now, so we have the plastic between the two items.  And this buckle, part of the plastic was compared to the abrasion or the white area underneath the abrasion.  Because the plastic is soft the plastic itself is not going to abrade it, it's the Velcro that can abrade it. * * * [next photo exhibit is introduced] * * * And we can come back to this.  There's a closer up.  Remember I said look at the corners of this abrasion, how they come down.  There's a little square here and it goes back down.  That's the same configuration of this into the buckle.  See how it comes down, it goes down, it goes down, this goes down, it goes down, it goes down.

Q.  Okay.  Is that injury that you depicted in State's Exhibit 129 consistent with having been made by that glove?

A.  It is. * * * [I]t's consistent with the pattern, it's consistent with the shape, it's consistent with the Velcro, roughened material, causing an abrasion.  And you have to remember, when somebody is being assaulted or strangled, they are trying – they are moving, their head is not going to stay in one spot and get a perfect impression.  They are fighting.

Q.  So it could be made by something like that or something very similar to that?

A.  Right.

* * *

Q. Is that based upon a reasonable degree of scientific certainty?

A. It is.

{¶ 56} Boaston cites Crim.R. 16(K) in support of his argument that the trial court abused its discretion in allowing Dr. Scala-Barnett to offer an opinion about the side-by-side comparison because a summary of her opinion was not included in the report of autopsy. Here, trial counsel discovered that the deputy coroner had formed an opinion about a matter not contained in the written report 19 days before trial. Boaston's failure to file a *pretrial* motion to compel a supplement to the report of autopsy or exclude the evidence constitutes a waiver of his objection to the state's use of this opinion testimony. For the reasons set forth in our discussion of appellant's first assignment of error, Boaston's second assignment of error is also not well-taken.

### Third Assignment of Error

{¶ 57} In his third assignment of error, appellant asserts that:

The trial court erred by allowing cell phone tower tracking evidence without establishing its scientific validity and reliability.

{¶ 58} For over 23 years, William Jay Gast has been employed as a detective with the Toledo Police Department. Since 2008, Detective Gast has attended various training sessions on the forensics of cellular technology. At trial, Detective Gast was certified, without objection, as an expert in "phone records analysis."

{¶ 59} Detective Gast explained that in the course of his investigation into Brandi's death he requested various cell phone records from several cell phone service

providers. The records included text messages and the duration of various cell phone calls. The records also included "cell tower" locations. In turn, the tower locations enabled Detective Gast to determine the approximate location of several cell phones at times relevant to the investigation.

{¶ 60} Prior to trial, Detective Gast prepared a 25 page "Fact Chronology" that included cell phone activity from Saturday, February 1, 2014, through Saturday, February 15, 2014. Detective Gast explained that on February 14, 2014, from 5:09 a.m. through 10:41 a.m. on February 14, 2014, Boaston's cellphone data usage indicates that his phone was utilizing the southeast section of Tower 17. Gast testified that this was consistent with Boaston's cell phone being located in the apartment during that time.

{¶ 61} However, at 11:36 a.m., Boaston's Sprint cell phone registered in the northeast sector of Tower 17. This data enabled the state to argue that Boaston was not at home as he suggested to the investigators, but on his way back from parking Brandi's car in the Fulton County field.

{¶ 62} Relying on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Boaston claims that the trial court erred by failing to conduct a hearing on the reliability of Detective Gast's cell tower testimony. However, Boaston never challenged the relevance and reliability of Gast's testimony in the trial court, thus he waived all but plain error. Crim.R. 52(B).

{¶ 63} Under Crim.R. 52(B), the appellant bears the burden of demonstrating that a plain error affected his substantial rights. *State v. Perry*, 101 Ohio St.3d 118, 2004-

22.

Ohio-297, 802 N.E.2d 643, ¶ 14.  In *State v. Barnes*, 94 Ohio St.3d 21, 2002-Ohio-68, 759 N.E.2d 1240, the Supreme Court of Ohio explained:

> By its very terms, [Crim.R. 52(B)] places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial.  First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain.  To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. (Internal citation omitted).
>
> *Id.* at 27.

"Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."  *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 64} The state asserts that Boaston cannot satisfy the three-prong test set forth in *Barnes* because Ohio courts have allowed cell tower utilization testimony from lay witnesses.  Thus, the state argues, trial counsel's failure to request a *Daubert* hearing was not an "obvious" defect.  We agree.

{¶ 65} Some Ohio courts have allowed non-experts to testify about a cell phone's tower utilization to identify the geographic area in which a phone was located at a specific period of time.  For example, in *State v. Daniel*, 8th Dist. Cuyahoga No. 103258,

2016-Ohio-5231, ¶ 69, the Eighth District Court of Appeals held that "the location of cellular towers used by appellant's phone in relation to other locations relevant to the crime * * * does not require 'specialized knowledge, skill, experience, training or education' regarding cellular networks." *See also State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 65 (A witness testifying about cell phone towers was not offering independent findings or forming an opinion, rather he simply "explained the contexts of the complex and detailed phone records.").

{¶ 66} Pursuant to the above, even if the trial court erred when it failed to sua sponte conduct a *Daubert* hearing to test the validity of Detective Gast's cell phone tower testimony, such error was not a plain or obvious defect in the trial proceedings, as various courts have found that testimony concerning cell phone towers need not come from an expert witness. Accordingly, Boaston's third assignment of error is not well-taken.

## Fourth Assignment of Error

{¶ 67} In his fourth assignment of error, Boaston asserts that:

> The trial court erred by allowing other acts and hearsay evidence characterizing appellant as hostile toward the victim.

{¶ 68} First, Boaston asserts that the trial court abused its discretion when it allowed the state to introduce improper character or other acts evidence.

{¶ 69} Evid.R. 404(B) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

24.

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The exceptions allowing the Evid.R. 404(B) evidence "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988), paragraph one of the syllabus. However, "the admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. Thus, we review the trial court's decision under an abuse of discretion standard.

**{¶ 70}** Boaston asserts that the trial court allowed impermissible character evidence when various witnesses were permitted to relay Brandi's statements about the "bathtub incident" to the jury. Boaston contends that the evidence was introduced to demonstrate that Boaston had a propensity toward violence. In response, the state argues that the evidence was admissible to prove the *identity* of Brandi's killer.

**{¶ 71}** Previously, this court has held that evidence of prior violence between a defendant and a murder victim is admissible if the prior incident is sufficiently connected in a temporal sense to the facts of the murder to be probative of the identity of the perpetrator. *See State v. Carter*, 6th Dist. Lucas No. L-13-1255, 2014-Ohio-5212, ¶ 28. Thus, we find that the trial court did not abuse its discretion by allowing evidence of Boaston choking Brandi in the apartment two weeks before Brandi died of strangulation.

{¶ 72} Second, Boaston asserts that the trial court abused its discretion when it allowed hearsay evidence of Brandi "telling others that Boaston tried to drown her in the bathtub" and that Brandi "feared he would kill her someday." In response, the state asserts that the statements were properly admitted as "excited utterances or then-existing state of mind or emotions."

{¶ 73} Evid.R. 803(2) defines the "excited utterance" exception to the hearsay rule as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶ 74} Evid.R. 803(3) defines the "then existing, mental, emotional, or physical condition" exception to the hearsay rule as "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed * * *."

{¶ 75} W.B. had encountered Brandi as she exited the bathroom with a towel on her head. He testified that it looked like she had just gotten out of the bath or shower. Brandi was "upset or scared" and indicated that Boaston "pounced on her" and "tried to drown her." The record demonstrates that Brandi experienced a startling event and her statements were made "under the stress of excitement caused by the event." Evid.R. 803(2). Accordingly, the trial court did not err when it held W.B.'s statement was allowed under the excited utterance exception to the hearsay rule.

26.

{¶ 76} Cindy testified that about two weeks before Brandi died, her daughter came to her house and tried to hide injuries to her face under the hood of her sweatshirt. When Cindy instructed Brandi to put the hood down, Brandi started crying and revealed what had happened in the bathtub. Brandi further stated that she was afraid Boaston "was gonna kill her one of these days."

{¶ 77} The record does not indicate that Brandi's visit to her mother occurred under the stress or excitement caused by the event. Rather, it occurred "about two weeks" before Brandi died. Thus, Cindy's hearsay statement about the bathtub incident was inadmissible under Evid.R. 803(2). We further note that the reasons or basis behind a victim's fearful state of mind are not admissible under Evid.R. 803(3). *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 74.

{¶ 78} The trial court did not err, however, in allowing Cindy to testify that Brandi was afraid of Boaston. Evidence that a victim had a fearful state of mind is admissible as a hearsay exception under Evid.R. 803(3) as a statement of "then existing state of mind, emotion, sensation or physical condition."

{¶ 79} In regard to statements about the bathtub incident made by Brandi's co-workers, we find that the record fails to demonstrate that the hearsay statements were made under Evid.R. 803(2) or (3). The state has not identified any other hearsay exception that would permit the statements, and this evidence should have been excluded.

{¶ 80} Under a Crim.R. 52(A) analysis, we find that the errors referenced above are harmless. Boaston was not prejudiced by the bathtub statements made by Brandi's

27.

mother and co-workers as the statements referenced the same incident that W.B. had described in detail.  Accordingly, Boaston's fourth assignment of error is not well-taken.

**Fifth Assignment of Error**

{¶ 81} In his fifth assignment of error, appellant asserts that "the trial court erred by allowing prosecutorial misconduct when the prosecutor stated facts not in evidence during closing argument."  Boaston asserts that on five separate occasions during closing argument, the prosecutor misrepresented the evidence or made improper, unfairly prejudicial statements.  Appellant did not object to the statements at trial.

{¶ 82} "[W]hen a defendant fails to object to a prosecutor's comments at trial, a reviewing court cannot reverse the conviction unless the comments arise to the level of plain error."  *State v. Bettem*, 7th Dist. Belmont No. 96-BA-39, 1999 Ohio App. LEXIS 142, 11 (Jan. 15, 1999).  "Prosecutorial misconduct rises to the level of plain error if it is clear that the defendant would not have been convicted in the absence of the improper comments."  *State v. Griffith*, 12th Dist. Butler No. CA95-10-167, 1996 Ohio App. LEXIS 4539, 29 (Oct. 14, 1996), citing *State v. Johnson*, 46 Ohio St.3d 96, 102, 545 N.E.2d 636 (1990), *cert. denied*, 494 U.S. 1039, 110 S.Ct. 1504, 108 L.Ed.2d 369 (1990). "The closing argument must, however, be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial."  *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980).

{¶ 83} Upon review of the closing argument as a whole, we find that the prosecutor's remarks did not rise to the level of plain error.  We cannot say that absent

the prosecutor's remarks, the jury would not have convicted Boaston. Accordingly, appellant's fifth assignment of error is not well-taken.

## Sixth Assignment of Error

{¶ 84} In his sixth assignment of error, Boaston asserts that:

The trial court erred by allowing an accumulation of errors that denied appellant's due process right to a fair trial.

{¶ 85} Separately, harmless error may violate a defendant's right to a fair trial when the errors are considered together. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). In order to find cumulative error present, we first must find that multiple errors were committed at trial. *Id.* at 398. "Next, we must find that there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." (Citations omitted.) *State v Thomas*, 2d Dist. No. 2000-CA-43, 2001 Ohio App. LEXIS 4226 (Sept. 21, 2001) (citations omitted). *See also State v. Moreland*, 50 Ohio St.3d 58, 69, 552 N.E.2d 894 (1990).

{¶ 86} Based on our review of the entire record, we do not find that there is a reasonable probability that the outcome of the trial would have been different but for the combination of separately harmless errors. Accordingly, Boaston's sixth assignment of error is not well-taken.

29.

**Seventh Assignment of Error**

{¶ 87} In his seventh assignment of error, appellant asserts that:

The trial court erred by not granting an acquittal pursuant to

Crim.R. 29.

{¶ 88} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 89} The crux of Boaston's argument is that the state generally failed to present sufficient admissible evidence from which the jury could have found the essential elements proven beyond a reasonable doubt. Boaston was charged with murder in violation of R.C. 2903.02(A). Pursuant to R.C. 2903.02(A), "[n]o person shall purposely cause the death of another." The admissible evidence in this case indicates that Boaston was in his apartment with Brandi on the morning of her death. He is the last known person to see Brandi alive.

{¶ 90} Two weeks before her death, Boaston and Brandi had a disagreement in the bathroom in her apartment that left her feeling as though he wanted to drown her. Brandi

30.

suffered physical injuries during the incident. In the days leading up to her death, it appeared that Brandi had little interest in reconciling her relationship with the father of her children. She moved in with her mother. She made plans to spend Valentine's Day evening with a female coworker and sent text messages of a mildly sexual nature to a male coworker.

{¶ 91} In the early morning hours of February 14, 2014, Boaston was "out with friends" looking for a gun or someone to "take care of business." He withdrew cash from his checking account. Brandi arrived at Boaston's apartment a few hours later. At 8:30 a.m., the children left the apartment to catch the bus for school. By Boaston's own admission, Brandi was alone with him at the apartment until 10:40 or 10:45 a.m. on February 14, 2014. Boaston was the last known person to see Brandi alive. Her body was found 20 miles north and west of Boaston's apartment.

{¶ 92} Boaston called 911 to report Brandi's disappearance at 11:45 p.m. on February 14, 2014. He was calm when an officer arrived at the apartment to fill out the missing person report. Boaston offered no information beyond the questions asked by the investigating officer.

{¶ 93} According to Boaston, Brandi ate a breakfast sandwich around 7:30 a.m. Brandi's children did not leave for school until 8:30. According to the coroner, Brandi died one to two hours after eating a breakfast sandwich. Thus, Brandi died sometime 8:30 and 9:30 a.m. Boaston indicated that Brandi was at the apartment until 10:40 or 10:45 a.m.

31.

{¶ 94} While there is no direct evidence that Boaston was in Fulton County on the morning of Brandi's death, there was no cell phone activity on Boaston's cell phone during the period of time Brandi's phone was traveling to Fulton County.

{¶ 95} While there is no direct physical evidence that Boaston strangled Brandi, the day after Brandi died, Boaston had a tear in his coat and scratches on his cheek and neck. Brandi's hair was found embedded in the Velcro of Boaston's glove. There was a mark under Brandi's chin that was similar in size and shape to Boaston's glove buckle.

{¶ 96} Prior to her death, Brandi had engaged in a flirtatious relationship with a co-worker and ended her relationship with Boaston. Boaston had a hard time "let[ting] her go" and "mov[ing] on" with his life.

{¶ 97} In the months prior to her death, Boaston was utilizing spyware to track Brandi's location and communications, yet after Brandi's disappearance, he appeared either unable or unwilling to share relevant data with family members and authorities.

{¶ 98} Boaston's friend, Derek Wood, testified that prior to Brandi's death, Boaston expressed concerns that Brandi was having a relationship with Daron. Derek testified that Boaston appeared depressed and saddened by the situation.

{¶ 99} In light of this evidence, taken together with the other evidence presented by the state, we conclude that the state presented sufficient evidence that Boaston purposely caused Brandi's death. Boaston's seventh assignment of error is not well-taken.

32.

**Conclusion**

{¶ 100} Based on the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24(A).

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

James D. Jensen, P.J.

_____
JUDGE

Christine E. Mayle, J.
CONCUR.

_____
JUDGE