[Cite as *State v. Walls*, 2018-Ohio-329.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                          Court of Appeals Nos. E-16-027
                                                                                  E-16-028
          Appellee

                                                        Trial Court Nos.  2013-CR-329
v.                                                                                2014-CR-284

Michael Walls                                          **DECISION AND JUDGMENT**

          Appellant                                    Decided:  January 26, 2018

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Pamela A. Gross, Assistant Prosecuting Attorney, for appellee.

Loretta Riddle, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, defendant-appellant, Michael Walls, appeals the

April 8, 2016, and May 18, 2016 judgments of the Erie County Court of Common Pleas.

For the following reasons, we affirm, in part, and reverse, in part, the trial court's April 8,

2016 judgment, and we affirm its May 18, 2016 judgment. Because the trial court's error was prejudicial to Walls, we remand this matter for a new trial on all charges.

## I. Background

**{¶ 2}** Michael Walls is the father of Me.W. and Mi.W. In June of 2013, Erie County Children's Services ("ECCS") received a referral alleging that then-16-year-old Me.W. and 13-year-old Mi.W. were not enrolled in school, were being locked in the house, and were being sexually abused by their father. On June 25, 2013, caseworker Rebecca Boger initiated a home visit. Detective Ken Nixon, of the Sandusky police department, accompanied her because Boger had been informed that there may be guns in the home.

**{¶ 3}** Boger and Detective Nixon knocked on the doors of the Walls' home, but no one answered. While they were discussing a plan of action, E.W., Walls' mother and the children's grandmother, drove up with the children in her car. They asked E.W. where they could find her son, and they talked with her about some of the allegations. Boger approached the vehicle to speak with the children, but they rolled up the windows and refused to speak to her. Detective Nixon approached the vehicle and Me.W. shouted, "Don't touch me!"

**{¶ 4}** Detective Nixon phoned Walls, and Walls indicated that he was on his way home. When he arrived, Boger and Detective Nixon briefly spoke with him about the allegations concerning the lack of schooling, sexual abuse, and guns in the home. Walls indicated that he would be contacting an attorney, and the home visit ended.

2.

{¶ 5} Boger interviewed several family members, including the children's mother, M.S. Boger learned that Walls and M.S. married when Walls was in his twenties and M.S. was just 14 years old. The couple had four children together, and M.S. left the marriage when Me.W. was about three years old. After the interviews, Boger continued to have concerns about the well-being of the children, and on June 27, 2014, ECCS obtained an ex parte emergency order for custody. Detective Nixon took the order to the Walls' home that day to personally serve it, but no one was home. He left a notice on the door.

{¶ 6} On June 28, 2013, the children could not be located. Detective Nixon spoke with Walls on the phone, and Walls told him to contact his attorney, Richard Grubbe. Walls then hung up. Detective Nixon called him back immediately and left a message that he needed to surrender the children. Detective Nixon then called Grubbe.

{¶ 7} By July 2, 2013, Walls had not surrendered the children. Detective Nixon left messages for Walls on July 2 and July 3. On July 15, 2013, Nixon spoke with the prosecutor's office about charging Walls with interference with custody. The next day, by tracking the signals sent from Walls' phone to various cell phone towers, it was determined that the family was in Florida. Law enforcement officials there apprehended Walls, and took the children into custody. ECCS employees flew to Florida and brought the children back to Ohio. Me.W. and Mi.W. were placed with foster families.

{¶ 8} Boger separately interviewed the children on July 26, 2013, at Michael's House, a child advocacy center. Both were initially nervous and polite, but became more

3.

aggressive, demanding that they be appointed an attorney. Mi.W. had a severe speech impediment suggestive of hearing difficulties. And concerns remained that Me.W. was being sexually abused. The children were referred to Randall Schlievert, M.D., a pediatrician specializing in child abuse, for examinations.

{¶ 9} Dr. Schlievert interviewed the children, along with Kim Jones, the child abuse clinic coordinator for Mercy Children's Hospital. They generated a report summarizing those interviews. Neither Me.W. nor Mi.W. disclosed physical or sexual abuse. Me.W. surmised that her older brother had made up rumors about her dad, and she told Dr. Schlievert that her brother is "crazy." She denied that she had ever engaged in sexual relations with anyone, but provided intimate details about masturbation. She was adamant that she wanted to go home. Mi.W. expressed that he missed his sister very much and remarked at one point that he could protect her.

{¶ 10} Dr. Schlievert observed in his report that Mi.W.'s speech was impaired and he was difficult to understand. As to Me.W., he noted that she was guarded, that she controlled the interview, and that she maintained a locked gaze during the interview, making him uncomfortable. He described her affect and behavior as "disturbing," but ultimately deferred any forensic exams because (1) there had been no disclosure of sexual abuse, and (2) Me.W. disclosed masturbation techniques that could account for any exam findings. He concluded that no further medical care was needed at his office.

{¶ 11} Boger conducted second interviews of Mi.W. on September 16, 2013, and Me.W. on September 20, 2013, after receiving information alleging that their older

4.

brother had sexually abused Me.W. She interviewed Me.W. a third time on November 22, 2013, after reviewing images on her laptop that were sexual in nature. No disclosures of sexual abuse by Walls were made at those interviews.

{¶ 12} On May 21, 2014, Me.W. for the first time disclosed to a teacher that she had been sexually abused by her father. On May 27, 2014, she told her father that she had disclosed this information, and shortly after telling him this, she recanted. In June of 2014, she went to the Sandusky police station and reaffirmed her earlier disclosures of abuse. She said that she recanted because her father told her to, and insisted that she had, in fact, been subjected to sexual abuse by her father. A review of telephone records revealed that Me.W. borrowed a friend's phone on May 27, 2014, from which she called her father.

{¶ 13} Walls was indicted on August 6, 2013, on two counts of interference with custody. These charges were premised on Walls transporting the children to Florida after receiving notice of the ex parte order granting custody to ECCS. On July 11, 2014, a 28-count indictment was issued, charging Walls with 10 counts of rape of a victim less than 10 years of age, violations of R.C. 2907.02(A)(1)(b); six counts of rape of a child less than 13 years of age, violations of R.C. 2907.02(A)(1)(b); eight counts of rape by force or threat of force, violations of R.C. 2907.02(A)(2); one count of pandering sexually oriented matter involving a minor, a violation of R.C. 2907.322(A)(1); and three counts of pandering obscenity involving a minor, violations of R.C. 2907.321(A)(3). Following

5.

a jury trial, Walls was convicted of all charges, save the pandering sexually oriented matter count, which was dismissed before trial.

{¶ 14} Walls appealed the trial court judgments, and he assigns the following errors for our review:

ASSIGNMENT OF ERROR NO. I:

A TRIAL COURT ERRS AND ABUSES ITS DISCRETION AND PREJUDICES A DEFENDANT WHEN IT ALLOWS AN EXPERT WITNESS FOR THE STATE TO TESTIFY WITHOUT THE STATE PROVIDING AN EXPERT REPORT PURSUANT TO CRIM.R. 16(K)[.]

ASSIGNMENT OF ERROR NO. II:

A TRIAL COURT ERRS AND ABUSES ITS DISCRETION WHEN THE COURT TELLS A WITNESS HOW TO ANSWER A QUESITON [sic] AND THE WITNESS ANSWERS THE QUESTIONS AS INSTRUCTED BY THE COURT[.]

ASSIGNMENT OF ERROR NO. III:

A TRIAL COURT ERRS, ABUSES ITS DISCRETION, AND VIOLATES A DEFENDANT'S CONSTITUTIONAL RIGHT WHEN A COURT ALLOWS AND INSTRUCTS PRIOR COUNSEL TO TESTIFY ABOUT PRIVILEGED AND CONFIDENTIAL COMMUNICAITONS[.] [sic]

6.

ASSIGNMENT OF ERROR NO. IV:

A TRIAL COURT ERRS BY NOT DISMMISING [sic] THE

PANDERING OBSCENITY COUNTS AS THE STATE FAILED TO

PROVE AN ELEMENT OF THE CHARGES[.]

ASSIGNMENT OF ERROR NO. V:

MICHAEL WALLS RECEIVED CONSTITUTIONALLY

INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL

COUNSEL FAILED TO MAKE OBJECTIONS TO PLAIN ERROR[.]

ASSIGNMENT OF ERROR NO. VI:

A TRIAL COURT ERRS BY NOT RETURNING DEFENDANT'S

PROPERTY AFTER TRIAL[.]

## II. Law and Analysis

{¶ 15} Walls challenges the trial court's decision to allow testimony from Dr. Schlievert (first assignment of error), and from Walls' former counsel (third assignment of error). He questions the trial judge's impartiality because he assisted a witness in wording an answer to a question on cross-examination (second assignment of error). He maintains that the evidence was not sufficient to support his convictions for pandering obscenity involving a minor (fourth assignment of error). He insists that his trial counsel was ineffective for failing to object to certain evidence (fifth assignment of error). And he argues that the trial court improperly denied his motion for return of property (sixth assignment of error). We address each of Walls' assignments of error.

7.

## A. Crim.R. 16(K)

{¶ 16} In his first assignment of error, Walls contends that the trial court erred by allowing Dr. Schlievert to testify beyond the scope of his written report, in violation of Crim.R. 16(K). He also contends that Dr. Schlievert's opinions were inadmissible because they were not stated to a reasonable degree of medical probability.

### 1. Dr. Schlievert's testimony exceeded the scope of his written report.

{¶ 17} Dr. Schlievert interviewed Me.W. and Mi.W. on August 1, 2013, and issued a report summarizing those interviews. The state produced this report to Walls well before trial, but in its opening statement, it became clear that it intended to elicit opinions that exceeded the scope of what was contained in the report. Defense counsel raised this issue with the court, and the state confirmed that it intended to question Dr. Schlievert about topics not included in the report, including delayed disclosure, grooming, and recantation. Walls objected and asked that Dr. Schlievert's testimony be limited to what was disclosed in his report.

{¶ 18} After hearing argument from counsel and reviewing relevant case law, the trial court overruled Walls' objection. The court admonished the state, however, that future Crim.R. 16(K) violations will result in exclusion of the expert's testimony. It allowed the state to question Dr. Schlievert in the manner it had planned.

{¶ 19} Dr. Schlievert testified about his interviews of Me.W. and Mi.W. and the contents of his report. He also explained the concept of "grooming," which he described as the process by which abusers progressively instill in a child the belief that it is

8.

"normal" or "not unusual" to engage in sexual conduct, and he discussed the reasons that victims delay in reporting or recant allegations of sexual abuse. In doing so, he cited a number of specific studies published in medical journals. He said that Me.W. showed signs of having been sexually traumatized and groomed, and he sensed that she was trying to protect her father. He described Me.W. as a "troubled young lady with some serious psychological issues" that "would fit with being sexually abused," and he expressed his view that her behaviors and reactions were typical of children who are victims of multi-year incest. Dr. Schlievert's written report does not contain any of these opinions.

{¶ 20} Dr. Schlievert acknowledged that these opinions were not set forth in his report. He claimed that while he believed sexual abuse was likely at the time of his interview, he could not make a diagnosis in his report because Me.W. did not disclose it to him. He said that his failure to note this impression in his report should by no means be interpreted that he did not have "grave concerns" of incest or sexual abuse. He said that he had a "gut feeling" and a "medical belief" that Me.W. was the victim of sexual abuse and incest, but he claimed that he was unable to make a diagnosis of sexual abuse for purposes of preparing a medical record that would one day be entered into evidence in legal proceedings. Dr. Schlievert nonetheless presented this diagnosis at trial through live testimony even though he conceded that he never saw the children after August 1, 2013, and he received no additional records pertinent to Me.W.'s case after that date.

9.

{¶ 21} Crim.R. 16(K) provides:

An expert witness for either side shall *prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion*, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. *Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.* (Emphasis added.)

{¶ 22} The vast majority of Dr. Schlievert's three-page report is dedicated to a factual summary of his interviews of the children, after which he states the following:

Forensic exams were deferred as there were no disclosures of sexual abuse. In addition, [Me.W.] has disclosure of masturbation/techniques would make it difficult to determine what caused a finding on her exam if we found one [sic]. Hence, there was no forensic usefulness to do an exam today.

There is no further medical care needed at our office. The kids should see a doctor for regular care as soon as possible. Thank you for referring [Me.W.] and [Mi.W.] to our program. If you have any questions, please call * * *.

The report does not set forth the findings, analysis, conclusions, or opinions about which he testified at trial, and it does not cite the studies and publications that he discussed during his testimony. When asked by the trial court whether Dr. Schlievert's report summarized his testimony about such things as grooming and delayed reporting, the state conceded: "No, it does not, not regarding those specific topics * * *."

{¶ 23} We have reviewed both Dr. Schlievert's written report and his trial testimony. Unquestionably, his testimony far exceeded the scope of his report. To the extent that the state did not disclose Dr. Schlievert's testimony, findings, analysis, conclusions, and opinions in a written report produced 21 days before trial, it violated Crim.R. 16(K).

**2. There are limits on a trial court's discretion under Crim.R. 16(K).**

{¶ 24} What we must next determine is whether the state's violation of Crim.R. 16(K) required the court to preclude it from offering Dr. Schlievert's undisclosed opinions, as Walls argues, or whether it was within the court's discretion to allow the testimony.

{¶ 25} The state maintains that it is within the trial court's discretion to fashion a sanction for a Crim.R. 16(K) violation, and it must impose the least severe sanction possible. Here, the state claims, the trial court reprimanded it on the record. It urges that "given the mild nature of the alleged discovery abuse," the oral reprimand was an appropriate sanction. It further maintains that prosecutorial violations of Crim.R. 16(K) are reversible only where it is shown that (1) the state willfully violated the rule,

11.

(2) foreknowledge of the information would have aided in preparing a defense, and (3) the defendant suffers prejudice. It insists that Walls cannot show any of these three elements.

{¶ 26} Ordinarily, "'[a] trial court has broad discretion to determine the appropriate sanction for a discovery violation, and a trial court's decision will not be reversed absent an abuse of that discretion.'" *State v. Alvarado*, 6th Dist. Lucas No. L-13-1225, 2015-Ohio-75, ¶ 42, citing *State v. Woods*, 4th Dist. Ross No. 13CA3396, 2014-Ohio-4429, ¶ 15. And generally speaking, the state's failure to disclose discoverable evidence under Crim.R. 16 does not constitute reversible error where the nondisclosure was not willful, foreknowledge of the withheld information would not have aided appellant's defense, and no prejudice resulted from the nondisclosure. *State v. Wiles*, 59 Ohio St.3d 71, 80, 571 N.E.2d 97 (1991).

{¶ 27} Effective July 1, 2010, Crim.R. 16 underwent comprehensive changes. As part of those changes, Crim.R. 16(K) was enacted, requiring for the first time that experts generate written reports and that those reports be disclosed 21 days before trial. "The purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." (Internal citations and quotations omitted.) *State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 33 (9th Dist.). To that end, Crim.R. 16(K) defines the consequence for failing to disclose an expert's written report

12.

as required by the rule: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial."

{¶ 28} Before the July 1, 2010 amendments to the rule, discretion was granted to the trial court under Crim.R. 16(E)(3) to remedy noncompliance with all Crim.R. 16 discovery requirements. It provided that "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." *See State v. Boaston*, 6th Dist. Lucas No. L-15-1274, 2017-Ohio-8770, ¶ 46. For the most part, the trial court maintains this discretion to sanction discovery violations, and this discretion is recognized under Crim.R. 16(L)(1):

> The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶ 29} But Crim.R. 16(L)(1) added an important limitation on the trial court's discretion: that it make orders "*not inconsistent with this rule*." (Emphasis added.) The plain language of Crim.R. 16(K) requires exclusion of an expert's testimony where a

13.

written report from the expert has not been disclosed. It would, therefore, be inconsistent with Crim.R. 16(K) to hold otherwise.

{¶ 30} Our review of the case law that has developed since Crim.R. 16(K)'s effective date reveals that many courts apply Crim.R. 16(L)(1) and hold that trial courts retain discretion to allow an expert's testimony despite the failure to disclose a written report. *See, e.g., State v. Opp*, 3d Dist. Seneca No. 13-13-33, 2014-Ohio-1138, ¶ 16 ("We therefore continue to apply the long-established precedent, which holds that questions regarding the admission or exclusion of evidence are within the trial court's discretion * * *, and we will apply this standard to the trial court's actions in connection with violations of Crim.R. 16(K).").

{¶ 31} We cannot reconcile this conclusion with the plain language of Crim.R. 16(K) which unambiguously precludes the expert's testimony. We, therefore, hold that Crim.R. 16(K) mandates exclusion of expert testimony where a written report has not been disclosed in accordance with the rule. In reaching this conclusion, however, we make several observations.

{¶ 32} First, the plain language of Crim.R. 16(K) *does* allow discretion to modify the deadline for disclosing an expert's written report, but only if good cause has been shown and no prejudice results to any party. *See e.g., State v. McGhee*, 11th Dist. Trumbull No. 2014-T-0106, 2017-Ohio-5773, ¶ 18, 20-21 (reversing and remanding for a new trial where state disclosed written report three days before trial without showing good cause and where prejudice resulted to defendant).

14.

{¶ 33} Second, where a written report has been produced, issues may arise where (1) the expert seeks to supplement or modify the opinions contained in the report, or (2) the parties genuinely debate whether the expert's proposed testimony exceeds the scope of what was disclosed in the report. These matters appropriately require the trial court to exercise discretion.

{¶ 34} Third, a party may waive a violation of Crim.R. 16(K). We have addressed a number of situations where this has happened. For instance, in *State v. Williams*, 6th Dist. Lucas No. L-14-1067, 2015-Ohio-1686, ¶ 17-21, we found, inter alia, that appellant waived the Crim.R. 16(K) violation by objecting only to the admission of the expert's report and not to the expert's testimony. And in *Boaston*, 6th Dist. Lucas No. L-15-1274, 2017-Ohio-8770, ¶ 39-49, we found that appellant waived the Crim.R. 16(K) violation because defense counsel failed to raise the issue until after opening statements, despite learning of the violation 19 days before trial during an interview with the expert, at which time the expert disclosed the substance of the opinions that she intended to offer at trial. We recognized in *Boaston* that Crim.R. 16(A) requires parties to exercise due diligence. This may require pretrial motion practice under Crim.R. 12 should it become known that an expert intends to express opinions and either (1) no written report was disclosed; or (2) the report is somehow deficient or incomplete.[1]

---

[1] In *State v. Luce*, 6th Dist. Lucas No. L-16-1028, 2017-Ohio-4472, ¶ 44-48, we noted that appellant failed to raise an objection to the Crim.R. 16(K) violation at or before trial, and we reviewed for plain error. Plain-error review was, however, effectively unnecessary because a trial court cannot address a Crim.R. 16(K) discovery violation that

{¶ 35} Finally, common sense should not be ignored when there has been clear compliance with the purpose of Crim.R. 16(K), which is to eliminate unfair surprise at trial by requiring advance disclosure of an expert's qualifications and opinions so that opposing counsel has sufficient time to prepare for cross-examination, retain a rebuttal expert, and seek court intervention if there is reason to believe that the disclosures are inadequate. For instance, in *State v. Retana*, 12th Dist. Butler No. CA2011-12-225, 2012-Ohio-5608, ¶ 49, the state did not provide the defense a "written report" from its expert, but six months before trial, it provided it with a transcript of the expert's testimony in a companion case, specifically articulating the expert's opinions. Clearly no unfair surprise or trial by ambush could be claimed where the defense had the expert's actual testimony in its possession a full six months before trial.

{¶ 36} And in *State v. Crosby*, 5th Dist. Guernsey No. 15 CA 000011, 2016-Ohio-571, ¶ 13-23, the state failed to disclose a "written report" from its expert, but six months before trial, it turned over the expert's PowerPoint presentation. This presentation contained the expert's conclusions, findings, and opinions, but not his analysis. Defendant claimed that knowledge of the analytical process employed by the expert was needed so that his own expert could refute the opinions and conclusions, but he never made any request to the state for a more detailed report during that six-month time period. Again, there was ample opportunity to ask the court to intervene if more

was never brought to its attention. In such situations, any error would be that of trial counsel, not the trial court.

16.

information was needed to understand the expert's opinions, and there was no unfair surprise or trial by ambush under this scenario.

{¶ 37} Subject to the caveats we have discussed, we hold that Crim.R. 16(K) requires exclusion of expert testimony where a written report containing the expert's testimony, findings, analysis, conclusions, or opinions has not been disclosed before trial.

### 3. The trial court erred by admitting the expert testimony.

{¶ 38} Here, although the state provided Dr. Schlievert's written report to Walls before trial, it is undisputed that the report wholly failed to disclose that Dr. Schlievert intended to testify about sexual grooming, delayed disclosure, or recantation. It did not identify the studies upon which Dr. Schlievert relied in forming his opinions. And it did not disclose his opinions that Me.W. was "a troubled young lady with some serious psychological issues" that would fit with someone being sexually abused, that she exhibited signs of someone who's been sexually traumatized and sexually groomed, that she exhibited behaviors typically seen in children who are incest victims, or that it was, in his opinion, likely that she had been sexually abused in the past. Because there was no genuine debate that Dr. Schlievert's proposed testimony exceeded the scope of what was disclosed in his report, it was incumbent on the court to preclude Dr. Schlievert from testifying to these undisclosed opinions.

{¶ 39} Moreover, it was not until the state's opening statement that there was any suggestion that Dr. Schlievert's testimony would exceed the scope of his report. There was no earlier opportunity, therefore, for Walls to seek the court's intervention. This is

17.

precisely the type of trial-by-ambush strategy that Crim.R, 16(K) was enacted to prevent. Upon learning of the proposed testimony, defense counsel properly objected at the earliest point possible, effectively preserving his objections for our review. Accordingly, Walls did not waive his objections to the Crim.R. 16(K) violation. It was error to allow Dr. Schlievert's testimony.

**4. The admission of the expert's undisclosed opinions resulted in prejudice.**

{¶ 40} Having found that the trial court erred in allowing Dr. Schlievert's testimony, we must determine whether that error is reversible. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

{¶ 41} The Ohio Supreme Court explained in *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23, that in performing a harmless-error inquiry, the state has the burden to prove that the error did not affect the defendant's substantial rights. It recognized that "substantial rights" "has been interpreted to require that the error must have been *prejudicial*." (Internal quotations omitted.) *Id.* It clarified that determining whether error is prejudicial requires appellate courts to evaluate "both the impact that the offending evidence had on the verdict and the strength of the remaining evidence." *Id.* at ¶ 25-26. Appellate courts "must excise the improper evidence from the record and then look to the remaining evidence" in order to determine whether there is "overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *Id.* at ¶ 29. An error in the admission of evidence is harmless only when

18.

"there is no reasonable possibility that the testimony contributed to the accused's conviction." *Id.* at ¶ 28. In addition, the conduct of the prosecutor "may combine with an evidentiary error to cause greater impact." *Id.* at ¶ 30.

{¶ 42} The Eleventh District considered whether prejudice resulted to the defendant in a factually analogous case. In *State v. McGhee,* 11th Dist. Trumbull No. 2014-T-0106, 2017-Ohio-5773, the state's witness list included the name of a physician specializing in child sexual abuse who served as the site director of the child advocacy center where the victim was examined, but it provided no written report from this doctor. Five days before trial, the defense moved to exclude his testimony after learning at a pretrial that the state intended to call the doctor to testify about the reasons for a victim's delayed disclosure of abuse. He argued that the state violated Crim.R. 16(K) by failing to provide an expert report from the witness within 21 days of trial. The state responded by providing a written report three days before trial.

{¶ 43} Noting that Crim.R. 16(K) grants discretion to modify the deadline for exchanging expert reports, and observing that the defense had known for several months that the doctor may be called to testify, the trial court denied the motion and permitted the testimony. The expert testified about the reasons for delayed disclosure of sexual abuse and why a victim may display no physical signs of abuse.

{¶ 44} On appeal, the Eleventh District acknowledged that Crim.R. 16(K) was enacted to prevent trial by ambush. It recognized that the rule allows the trial court to modify the deadline for disclosing written reports from experts, but it emphasized that

19.

"good cause" must be shown and there must be no prejudice to any party. It found that the state did not show good cause for waiting until three days before trial to disclose its expert's written report. It also found that the doctor's testimony was "vital" because without it, "a jury might well question [the victim's] testimony that [defendant] had been molesting her for four years." *Id.* at ¶ 20. It observed that the doctor's testimony "may have significantly buttressed her credibility." *Id.* Because the state failed to show good cause and because prejudice resulted to the defendant, the Eleventh District reversed and remanded the case to the trial court for a new trial.

**{¶ 45}** We must reach the same conclusion here. First, it is clear that the state intended for Dr. Schlievert's testimony to carry great weight with the jury. His experience and education in child abuse pediatrics were presented to emphasize that he was qualified to diagnose Me.W. and to express opinions about how this diagnosis manifested itself in her behavior and reactions. He was the only expert to do so. *See State v. Holt*, 17 Ohio St.2d 81, 86, 246 N.E.2d 365 (1969) ("Because of the witness's educational background and his apparent prestige, his testimony undoubtedly made an impression on the jury and was accorded greater weight than it was entitled to."). *Compare State v. Luce*, 6th Dist. Lucas No. L-16-1028, 2017-Ohio-4472, ¶ 47 (finding no prejudicial error in admission of expert's undisclosed opinions where "the remaining admissible evidence contained in the record contains much of the same information as [the expert] provided during his testimony").

20.

**{¶ 46}** Additionally, there was no physical evidence in this case. The state's case hinged largely upon whether the jury believed Me.W. Dr. Schlievert's testimony was important to overcome credibility issues arising from (1) Me.W.'s repeated denials of abuse, (2) her initial statements of support for her father, (3) her delayed disclosure of abuse followed by recantation, and (4) additional instances of dishonesty explored during Me.W. and others' testimony.

**{¶ 47}** Finally, the state further emphasized the improper evidence by repeatedly referencing Dr. Schlievert's testimony in its closing argument. For example, the state told the jury that they should believe Dr. Schlievert. The prosecutor told the jury:

> [Dr. Schlievert is] a child abuse pediatrician. He's been treating abused children for 15 years exclusively. You saw his resume. You saw him testify. You saw him spouting off articles and referencing statistics. I mean, the guy knows his stuff. He's seen hundreds, maybe even thousands of patients. * * * It was clear to Dr. Schlievert that [Me.W.] was protecting someone. He said these psychologic – this psychological damage, it leaks through. You can see through it. He could see through it because he's trained to see through it. He said that [Me.W.'s] behavior was consistent with a sexually abused child. Not just sexually abused, but a sexually abused child of incest.

**{¶ 48}** The state's closing argument also highlighted that Dr. Schlievert testified that Me.W.'s delayed disclosure of abuse "is extremely typical of kids of sexual abuse.

21.

They wait until they're comfortable. He said late disclosure is also very common when there's a lack of a mother. What do we have here. No mother."

{¶ 49} And the state relied upon Dr. Schlievert's testimony to explain Me.W.'s recanting of her initial allegations of abuse, telling the jury that Dr. Schlievert explained that this is "very typical for these kids of sexual abuse to recant, especially when the abuse is from a parent and especially when there's a lack of support of a non-offending caretaker. No mom."

{¶ 50} The state's multiple references to the importance of Dr. Schlievert's testimony served to highlight the error to the jury, and further demonstrates why Dr. Schlievert's opinions were "vital to the state's case." *See McGhee,* 11th Dist. Trumbull No. 2014-T-0106, 2017-Ohio-5773, at ¶ 20; *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 30. Moreover, given that Dr. Schlievert's undisclosed opinions buttressed the credibility of Me.W's testimony, it is impossible to "excise the improper evidence" to determine whether the remaining evidence, alone, overwhelmingly supports a guilty verdict. *Id.* at ¶ 29.

{¶ 51} Because of the impact of Dr. Schlievert's testimony and the state's actions in emphasizing the improper testimony for the jury, we find that there is "a reasonable possibility that the testimony contributed to the accused's conviction." *Id.* at ¶ 28. We therefore cannot find harmless error and, instead, we must conclude that Walls was prejudiced by the admission of Dr. Schlievert's undisclosed opinions. *Id.* The admission

22.

of his testimony constituted reversible error requiring remand to the trial court for a new trial.

### 5. The expert's opinions were not competent.

{¶ 52} Walls also points out that Dr. Schlievert's opinions were not stated to a reasonable degree of medical probability. "A medical expert's opinion testimony is only competent if it is held to a reasonable degree of medical certainty or probability." *State v. Smith*, 4th Dist. Ross No. 02CA2687, 2003-Ohio-5524, ¶ 16. Dr. Schlievert testified that he did not make a medical diagnosis in his report because he lacked diagnostic certainty:

> Well, I think I was careful to say on direct with [the state] that those were gut feelings, medical beliefs, but because of the lack of disclosure, I did not feel that I could make a certain final diagnosis of sexual abuse that would go on a record that would then enter legal proceedings. * * *

{¶ 53} Dr. Schlievert nonetheless testified at trial that it was his "medical opinion" that "[Me.W's] behavior [was] consistent with a sexually abused child." Dr. Schlievert made this diagnosis before the jury even though the state never established that the opinions to which he testified were held to a reasonable degree of medical probability. As such, his opinion testimony was not competent.

{¶ 54} Because Dr. Schlievert's opinions were improperly admitted at trial and Walls was prejudiced by the error, we find Walls' first assignment of error well-taken. Our conclusion necessitates a remand to the trial court for a new trial.

23.

## B. The Court's Instruction to the Witness

{¶ 55} In his second assignment of error, Walls claims that the trial court erred in instructing Me.W. how to phrase an answer to a question from defense counsel.

{¶ 56} At trial, Me.W. testified that at one point after being removed from her father's custody, she lived with her mother, with whom she had had virtually no relationship since she was three years old. On cross-examination, defense counsel asked Me.W. why she left her mother's house. Me.W. responded that her mother had kicked her out. When defense counsel asked why, the state objected and asked to approach the bench. The state advised the court that it did not know how Me.W. would respond to the question, but it reminded the court that it had granted a motion in limine precluding testimony about Me.W.'s juvenile record, which apparently included an adjudication of delinquency for a domestic violence incident involving her mother.

{¶ 57} The trial court reiterated that it would not allow evidence of Me.W.'s juvenile record, and the state asked if the court would advise Me.W. that she may not discuss this topic. The court asked defense counsel if he objected to it telling Me.W. to avoid the topic of her juvenile record, and defense counsel said no. The court, therefore, told Me.W. not to talk about it at all. Me.W. then asked the court how she should respond to defense counsel's question given that the domestic violence incident was "one of the major reasons" she was kicked out of her mother's house. The court told her "[j]ust say we had issues, I got (inaudible)."

{¶ 58} Walls argues that the trial court abused its discretion by telling the witness how to answer the question. He insists that this constituted reversible error because the trial judge gave the appearance that his independence, integrity, and impartiality were compromised, thus undermining public confidence in the judiciary, and violating the Code of Judicial Conduct. He claims that his counsel did not object to this at trial because he could not hear what the judge told Me.W.

{¶ 59} The Ohio Code of Judicial Conduct imposes a duty on trial judges to remain independent and impartial and to avoid the appearance of impropriety. Jud.Cond.R. 1.2. Certainly, it is not appropriate for a judge to tell a witness how to answer a question, but we observe here that (1) the trial judge was acting to prevent inadmissible evidence from being injected into the trial, (2) while he supplied the witness with an intentionally vague response to avoid the evidentiary concern, he did not instruct her to be dishonest, and (3) the conversation with the witness took place outside the hearing of the jury.

{¶ 60} The better approach here would have been to sustain the state's objection and instruct the witness not to answer the question. But we see no evidence of bias by the trial court, and we fail to see how Walls was prejudiced. *See State v. Gilbert*, 6th Dist. Lucas No. L-95-140, 1996 Ohio App. LEXIS 1133, *9-11 (Mar. 29, 1996) (overruling appellant's challenges to the trial judge's instruction to prosecutor as to what to say in introducing evidence where discussion took place outside the hearing of the

jury, the trial judge did not exhibit lack of neutrality or impartiality, and no prejudice resulted to defendant).

{¶ 61} We find Walls' second assignment of error not well-taken.

### C. The Testimony of Walls' Former Counsel

{¶ 62} In his third assignment of error, Walls claims that the trial court erred in ordering his prior counsel to respond to questions arising from his representation of Walls.

{¶ 63} The state called Grubbe as a witness in its case-in-chief, and Walls objected on the basis of attorney-client privilege. The court conferred with the parties concerning Walls' objection. It was advised that phone records showed that Grubbe left messages for Walls on July 1, 2013, at 12:55 and 1:06 p.m. This was shortly after Grubbe spoke with Detective Nixon about the need for Walls to surrender the children into ECCS custody. In the first message, Grubbe simply left his name and number and asked that Walls return the call. The second message was more substantive.

{¶ 64} The court ruled that the content of Grubbe's second message was protected by the attorney-client privilege, but Walls sought to exclude the first message as well, arguing that (1) his identity as Grubbe's client, and (2) the fact that Grubbe contacted Walls were protected by privilege unless waived. The court found that neither Walls' identity as Grubbe's client nor the fact that Grubbe contacted Walls was protected by privilege, and it allowed Grubbe to testify.

26.

**{¶ 65}** On direct examination, the state asked Grubbe if he knew Walls. Grubbe admitted that he knew Walls "by telephone," and represented him between June 25, 2013, and July 16, 2013. He testified that he spoke with Detective Nixon about Walls, and admitted that after speaking with Detective Nixon, he contacted Walls.

**{¶ 66}** "The burden of showing that testimony [should] be excluded under the doctrine of privileged attorney-client communications rests upon the parties seeking to exclude it." *Lemley v. Kaiser*, 6 Ohio St.3d 258, 263-264, 452 N.E.2d 1304 (1983). Generally, a client's name or identity is not protected by the attorney-client privilege because it is not a fact about which the client seeks legal assistance. *Id.* at 264. This is especially true here given that Walls disclosed to Detective Nixon that Grubbe represented him. We, therefore, conclude that Walls' identity as Grubbe's client was not protected by the attorney-client privilege.

**{¶ 67}** As to Grubbe calling Walls after speaking with Detective Nixon, the attorney-client privilege protects the substance of communications—"not the fact that there has been communication." *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481, 484 (D.Kan.1997), citing *United States v. Kendrick,* 331 F.2d 110, 113 (4th Cir. 1964); *Howell v. United States*, 442 F.2d 265 (7th Cir. 1971); *Gallimore v. Children's Hosp. Med. Ctr.*, 1st Dist. Hamilton Appeal Nos. C-890808, C-890824, 1992 Ohio App. LEXIS 850, *20-21 (Feb. 26, 1992) ("We have found no persuasive or controlling legal authority to equate, as a matter of testimonial privilege, the fact of communication with the content of communication * * *."); *State v. Kemper*, 158 Ohio App.3d 185, 2004-Ohio-4050, 814

27.

N.E.2d 540, ¶ 16 (2d Dist.) (holding that attorney's testimony that she provided defendant notice of hearing did not constitute a "communication" or "advice" and was therefore outside the scope of the attorney-client privilege); *State v. Hicks*, 4th Dist. Highland No. 08CA6, 2009-Ohio-3115, ¶ 15 (finding that attorney's testimony that he made several attempts to get notice of the scheduled trial date to defendant was outside the scope of the attorney-client privilege).

{¶ 68} We, therefore, conclude that the trial court did not err in requiring Grubbe to answer the state's question about whether he contacted Walls after speaking with Detective Nixon. Accordingly, we find Walls' third assignment of error not well-taken.

## D. Sufficiency of the Evidence Concerning the Pandering Obscenity Conviction

{¶ 69} In his fourth assignment of error, Walls argues that the state failed to prove all elements of the offense of pandering obscenity involving a minor. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

28.

**{¶ 70}** R.C. 2907.321(A)(3) provides that "[n]o person, with knowledge of the character of the material or performance involved, shall * * * [c]reate, direct, or produce an obscene performance that has a minor as one of its participants." The pandering obscenity charges here were based on evidence that Walls (1) instructed Me.W. and her older brother to engage in a number of sexual acts in front of him while he masturbated; (2) instructed Me.W. to insert a toy hot dog into her vagina while he watched; and (3) directed Me.W. to engage in sexual acts with a dog and to masturbate in front of him. Walls argues that the state failed to establish the "obscene performance" element of the offense because there was no evidence presented that he created any materials, such as photos or videos.

**{¶ 71}** R.C. 2907.321(A)(3) prohibits the creation, direction, or production of an obscene *performance* involving a minor. R.C. 2907.01(K) defines "performance" as "any motion picture, preview, trailer, play, show, skit, dance, or other exhibition performed before an audience." R.C. 2907.01(F)(5) provides the standard for determining whether any material or performance is obscene. None of these provisions require that material be produced in order for a performance to constitute an "obscene performance." We find no error in the state's failure to prove that Walls created photos, videos, or other materials of the sex acts that he instructed Me.W. to perform in front of him because this is not an element of the offense.

**{¶ 72}** We find Walls' fourth assignment of error not well-taken. However, while we find that the state need not show that "materials" were created to prove a violation of

29.

R.C. 2907.321(A)(3), our resolution of Walls' first assignment of error requires that he be retried for these offenses.

### E.  Ineffective Assistance of Counsel

{¶ 73} In his fifth assignment of error, Walls claims that his trial counsel was ineffective in failing to make objections to (1) Dr. Schlievert's testimony as to his "impressions," and as to what he "thought," "believed," or "felt," rather than the opinions he held to a reasonable degree of medical probability; (2) the testimony of Walls' prior counsel; (3) evidence that Walls instructed his children to ask for a lawyer; and (4) hearsay statements of Me.W. that bolstered her credibility or explained her actions.

{¶ 74} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995).  To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

30.

{¶ 75} Walls' first challenge to his attorney's performance is rendered moot by our resolution of his first assignment of error. As to his challenge to the failure to object to the testimony of his prior counsel, the record demonstrates that defense counsel arduously objected to his testimony, and we have found that his prior counsel's testimony was properly allowed. As to his challenge to the failure to object to evidence that Walls instructed his children to ask for an attorney, he does not explain why this evidence was objectionable or how the outcome of the proceedings would have been different had an objection been raised. And as to his challenge to the failure to object to hearsay statements of Me.W., he has failed to specifically identify in the record the statements to which he refers. It is not our obligation as the appellate court to search the record or formulate legal arguments on behalf of the parties. *Risner v. Ohio Dept. of Natural Resources*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 28.

{¶ 76} We find Walls' fifth assignment of error not well-taken.

### F. The Return of Walls' Property

{¶ 77} In his sixth assignment of error, Walls claims that the trial court erred in denying his motion for the return of his property that was not used as evidence, including computers and phones. The trial court engaged in a detailed analysis of Walls' request. Because of the potential that the case could be remanded for a new trial and the state may choose to use the evidence at a new trial, the court held that the items would remain in the custody of law enforcement "until they were no longer needed as evidence."

31.

**{¶ 78}** We held in *State v. Rivera*, 6th Dist. Lucas No. L-13-1170, 2014-Ohio-742, ¶ 8, that where the "appellant continues to challenge the validity of his convictions, there is a possibility that the seized property might need to be used as evidence in a future retrial." We, therefore, found no error in the trial court's refusal to order the state to return appellant's seized property. *Id.* at ¶ 9. Consistent with *Rivera*—and particularly in light of our conclusion here that Walls is entitled to a new trial—we find no error in the court's decision denying Walls' motion for the return of property.

**{¶ 79}** We find Walls' sixth assignment of error not well-taken.

### III. Conclusion

**{¶ 80}** We find Walls' first assignment of error well-taken. The trial court erred in refusing to limit Dr. Schlievert's testimony to the findings, analysis, conclusions, and opinions disclosed in his written report, as required under Crim.R. 16(K). This error prejudiced Walls and requires that a new trial be conducted.

**{¶ 81}** We find Walls' second, third, fourth, fifth, and sixth assignments of error not well-taken. The trial court committed no prejudicial error in advising Me.W. how to respond to a question to avoid disclosing inadmissible evidence. Walls' identity as Grubbe's client and the fact that Grubbe contacted Walls was not information protected by the attorney-client privilege. A violation of R.C. 2907.321(A)(3) does not require proof that photos, videos, or other material were created from an obscene performance. Counsel was not ineffective for failing to object to certain evidence. And the trial court

32.

properly denied Walls' motion to return his property because it may be used as evidence in later proceedings.

{¶ 82} We affirm, in part, and reverse, in part, the April 8, 2016 judgment of the Erie County Court of Common Pleas, and we affirm its May 18, 2016 judgment. We remand this matter to the trial court for a new trial on all charges. The costs of this appeal are assessed to the state under App.R. 24.

Judgments affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

James D. Jensen, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

33.